**Jerry W. MATTHIAS and Kathryn A. Schurber, Plaintiffs–Appellees,**

v.

**Dallas H. BINGLEY, et al., Defendants,**

**City of Houston, Defendant–Appellant.**

**No. 88–6125.**

United States Court of Appeals, Fifth Circuit.

July 26, 1990.

Robert L. Cambrice, Murray E. Malakoff, Asst. City Attys., Clarence A. West, City Atty., Houston, Tex., for defendant-appellant.

Robert A. Shults, Sheinfeld, Maley & Kay, Clinard J. Hanby, Essmyer & Hanby, Houston, Tex., for plaintiffs-appellees.

Before GOLDBERG, POLITZ and JONES, Circuit Judges.

GOLDBERG, Circuit Judge:

*Statement of Facts*

In August, 1982, Dallas H. Bingley, Allen Harris, and other City of Houston ("the City") police officers lawfully seized property belonging to plaintiffs Jerry Matthias and Kathryn Schurber. The property included stereo equipment, a video cassette recorder, a movie projector, three cameras, binoculars, two briefcases, silver serving pieces, jewelry, gold coins, hunting knifes and rifles, and personal mementos. The two detectives, Harris and Bingley, tagged the plaintiffs' property into three groups numbered 5–518–1, 5–521–1, and 5–539–7. They turned the seized property over to the Property & Supply Division of the Houston Police Department. All of Harris's and Bingley's actions fully complied with the applicable City ordinance and police department regulations.

Even though the Property & Supply Division stored the property, the two detectives controlled the property's disposition. The Property & Supply Division could not do anything with the property until the detectives completed a "Disposition Authorization Form." After holding the property for ninety days, the Property & Supply Division sent Disposition Authorization Forms to the two detectives. The forms list seven options for handling the property: (1) hold

for court case; (2) hold for investigation; (3) hold for possible surety bond indemnity agreement; (4) photograph and release to owner; (5) release to owner (or authorized person); (6) dispose of as authorized by City ordinance; (7) not wanted by this division, seek authorization from _____.

Options (4) and (5) require the officer completing the form to state the method of notifying the owner or authorized person. The options list three forms of notification: (a) in person, (b) by phone, or (c) by mail (must be certified, return receipt requested, if property is valued at $200 or more). An asterisk next to option (6) refers to a provision that appears at the bottom of the form. That provision reads:

Alternative # 6 [Dispose of as Authorized by City Ordinance] is to be selected only after the property is no longer needed as evidence or for investigation, and after all reasonable efforts to return the property to the rightful owner have been exhausted by the investigative division.

City Ordinance Section 34–31 establishes the steps an officer must take before instructing the Property & Supply Division to dispose of the property (option (6) on the form).[1] The ordinance requires the police officers to "make a good faith effort to identify, locate and give notice to the lawful owner of any unclaimed property." The ordinance does not specify how officers determine the identity of the lawful owner. Nor does it require officers to notify the person from whom they seized the property unless the officers believe that person is the lawful owner of the property. If the officers decide that the person does not own the property, the officers need not notify that person or give her an opportunity to be heard. If, after a good faith effort, the officers cannot determine the identity of the lawful owner, they may authorize the Property & Supply Division to dispose of the property as provided in the ordinance.

The two detectives completed at least four Property Disposition Forms. On November 23, 1982 and again on May 26, 1983, Harris instructed the Property & Supply Division to hold for investigation the batch of property tagged 5–521–1 (option 2). On November 17, 1982, Bingley instructed the Property & Supply Division to dispose of the batch tagged 5–518–1 as authorized by City ordinance (option 6). Neither the detectives nor the Property & Supply Division notified Matthias and

1. The ordinance provides:

Sec. 34–31. Effort to identify and locate owner of unclaimed property to be made; notice.
(a) The police department shall make a good faith effort to identify, locate and give notice to the lawful owner of any unclaimed property. When the lawful owner has been determined, notice shall be given by the police department as follows:
(1) Personal notice; or
(2) Telephone notice when the conversation is held with the lawful owner; or
(3) In the case of property with a fair market value in the city of less than two hundred dollars ($200.00), notice by United States mail to the lawful owner's last known address; or
(4) In the case of property with a fair market value in the city of two hundred dollars ($200.00) or more, notice by United States certified mail, return receipt requested, to the lawful owner's last known address.
The notice shall state that certain property is being held by the police department, give the location and address of where such property is being held or stored, and give the owner a minimum of thirty (30) days within which to reclaim said property; provided, however, that in no event shall the date given such owner to reclaim the unclaimed subject property be less than ninety (90) days from the date such property came into the possession of the police department. The notice shall additionally state that if the owner fails to reclaim such property by the date stated in the notice, such property shall be deemed abandoned and shall be disposed of in the manner prescribed herein below.
(b) Upon the expiration of a period of not less than ninety (90) days from the date the property came into the possession of the police department as described hereinabove, if, after a good faith effort, the lawful owner of such property has not been determined or if the lawful owner has been notified by the police department as aforedescribed and has failed to reclaim such property in a timely manner as aforedescribed, such property shall be deemed abandoned and shall be disposed of in the manner described hereinbelow.
Code 1968; Section 34–15.3; Ord. No. 77–561; Section 4, 3–16–77. For convenience, we will refer to this provision in the ordinance as "Ordinance 34–31."

Schurber that the City planned to dispose of the property.

On November 26, 1982, the Property & Supply Division sent a Property Disposition Form to the detectives for the property in batch 5–539–7. When the form returned to the Property & Supply Division, "Harris" appeared in longhand on the upper right hand corner of the form. Option 6, which directs the Property & Supply Division to dispose of the property as authorized by City ordinance, had been checked. No-one dated and signed the form as required. When the Property & Supply Division received the form for batch 5–539–7, the person sorting the Property Disposition Forms placed the unsigned form in a stack to be "Disposed of as Authorized by City Ordinance." Because no-one signed the form, the Property & Supply Division should have returned the form to the Burglary and Theft Division for a signature and a date. No-one in the Property & Supply Division attempted to notify Matthias and Schurber of the pending disposition.

On December 5, 1982, the Property & Supply Division transferred the property in batch 5–518–1 to the City's Treasury Department's Surplus and Salvage Division. In doing so, the Property & Supply Division complied fully with police department regulations. On January 25, 1983, the Property & Supply Division transferred the property in batch 5–539–7 to the City's Surplus and Salvage Division. Because no one had signed the form as required, the transfer did not comply with police department regulations. The City sold most of the property in the two batches at public auctions in May and June, 1983.

On July 27, 1983, Harris and Bingley discovered that the City had disposed of the plaintiffs' property in batch 5–539–7. On August 9th, Captain Earl B. Goodrum, chief of the Property & Supply Division,

learned of the disposition. Goodrum instructed H.L. McCormick, a sergeant in the Property & Supply Division, to investigate the unauthorized disposition of the property in batch 5–539–7. He did not authorize investigation of batch 5–518–1 (presumably because the police department fully complied with department regulations when it disposed of that batch). McCormick reported that Harris apparently had the responsibility to complete the form for batch 5–539–7. Goodrum concluded that human error caused the unauthorized disposition. The police chief then instructed the Houston Internal Affairs Division to investigate the disposal of the property in batch 5–539–7. He did not instruct the Internal Affairs Division to investigate the disposal of the property in batch 5–518–1. Like the Property & Supply Division, the Internal Affairs Division concluded that human error caused the unauthorized disposal of batch 5–539–7. As a result of these investigations, the Property & Supply Division changed its procedures. Now property may not be disposed of until the receiving Property & Supply Division personnel and either the Property & Supply Division lieutenant or day shift sergeant signs the Property Disposition Form.

After the officers seized their property, Matthias and Schurber repeatedly asked the City to return their property. Finally, a state judge gave Matthias and Schurber a court order instructing the City to return the property. When they presented the court order in January, 1984, they discovered that the City had sold most of the property in batches 5–518–1 and 5–539–7 and converted the rest to City use. The plaintiffs did recover some of the converted property.

Matthias and Schurber sued the City and the police department[2] under 42 U.S.C. Section 1983.[3] They challenged the disposi-

---

**2.** For convenience, we will refer to the two defendants collectively as "the City." The plaintiffs also sued Bingley and Harris. The two officers have been dismissed from the suit.

**3.** 42 U.S.C. Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of

any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper

tions of the property in both batches 5–518–1 and 5–539–7. The plaintiffs contended that the City violated their due process rights because it failed to give them notice and an opportunity to be heard before disposing of their property.

The jury found for the plaintiffs. In its answers to special interrogatories, the jury found that the defendants followed official City policy when they failed to give notice and an opportunity to be heard to Matthias and Schurber before disposing of their property. The jury also found that the failure to give notice and an opportunity to be heard proximately caused the loss of Matthias's and Schurber's property.

The plaintiffs sought $55,000 in compensatory damages, pre- and post-judgment interest, fees, and costs. The jury awarded them $55,374.88 in damages. After an evidentiary hearing, the district judge awarded the plaintiffs $25,241.88 in prejudgment interest and $67,164.81 in attorney's fees and costs.

### Standard of Review

■■■ The City moved for a directed verdict at the close of the plaintiffs' evidence and at the close of all the evidence but did not move for a judgment *n.o.v.* Because the City moved for a directed verdict, we may examine the sufficiency of the evidence. *See Zervas v. Faulkner*, 861 F.2d 823, 832 n. 9 (5th Cir.1988). *But see Dietz v. Consolidated Oil & Gas, Inc.*, 643 F.2d 1088 (5th Cir.1981); *University Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518, 548 (5th Cir.1974); and *Stockton v. Altman*, 432 F.2d 946 (5th Cir.1970).[4] We consider all the evidence, not just the evidence supporting the nonmoving party's case, in the light most favorable to the nonmoving party. *Boeing Co. v. Shipman*, 411 F.2d 365, 374–375 (5th Cir.1969) (en banc). However, because the City did not move for a judgment *n.o.v.*, we may not reverse and render a judgment in favor

of the City if we are so inclined. Instead, we only may reverse and order a new trial. *Zervas*, 861 F.2d at 832 n. 9; *Smith v. Trans–World Drilling Co.*, 772 F.2d 157 (5th Cir.1985); 5A *Moore's Federal Practice* Section 50.12 (2d ed.).

### Discussion

#### The City's Policies Violate the Due Process Clause

■■ Section 1983 protects all rights guaranteed by the Fourteenth Amendment. *Home Telephone & Telegraph Co. v. Los Angeles*, 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 510 (1913); *Findeisen v. North East Independent School District*, 749 F.2d 234 (5th Cir.1984). The Fourteenth Amendment's Due Process Clause states that "[No] State [shall] deprive any person of life, liberty, or property, without due process of law." Of course, the plaintiffs' personal belongings disposed by the City in this case falls under the rubric "property" governed by the Due Process Clause.

What rights does the Due Process Clause protect? As the Supreme Court so aptly wrote: "The point is straightforward: the Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985). Those "constitutionally adequate procedures" require notice and an opportunity to be heard. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950); *see also Tulsa Professional Collection Services v. Pope*, 485 U.S. 478, 108 S.Ct. 1340, 1344, 99 L.Ed.2d 565 (1988). Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*,

---

proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

4. Many of these cases rely on *Delchamps, Inc. v. Borkin*, 429 F.2d 417, 418 (5th Cir.1970) (per curiam). However, in *Delchamps* the appealing party did not move for a directed verdict or a judgment *n.o.v.*

339 U.S. at 314, 70 S.Ct. at 657. In the years since *Mullane* the Supreme Court has "adhered unwaveringly" to the principal announced in *Mullane, Mennonite Board of Missions v. Adams,* 462 U.S. 791, 797, 103 S.Ct. 2706, 2710–2711, 77 L.Ed.2d 180 (1983), balancing the "interest of the State" and "the individual interest sought to be protected by the Fourteenth Amendment." *Tulsa Professional Collection Services,* 108 S.Ct. at 1344 (quoting *Mullane,* 339 U.S. at 314, 70 S.Ct. at 657).

By requiring notice and an opportunity to be heard, the Due Process Clause permits persons whose interests may be adversely affected by government decisions to participate in those decisions. This participation, in turn, reduces the number of erroneous deprivations of life, liberty, or property. *See Block v. Rutherford,* 468 U.S. 576, 605, 104 S.Ct. 3227, 3242–3243, 82 L.Ed.2d 438 (1984) (Marshall, J., dissenting); *Thibodeaux v. Bordelon,* 740 F.2d 329, 336, (5th Cir.1984). In this case, such notice would have prevented the City from erroneously depriving Matthias and Schurber of their property.

In *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Court listed the interests that must be balanced in each case to determine what form of notice and hearing the Due Process Clause requires:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903.

█ The procedures in this case affect a substantial private interest: the personal belongings of two people. City Ordinance 34–31 creates a high risk of erroneous dep-

rivations of property. The fact that the City disposed of the plaintiffs' property in this case despite Matthias's and Schurber's repeated inquiries about their property exemplifies the high risk of erroneous deprivations this system permits.

First, City Ordinance 34–31 creates a high risk of erroneous deprivation because it instructs police officers to notify *only* "lawful owners" of property in police custody. It does not instruct officers to notify other persons with colorable claims to the property. For example, the ordinance does not instruct officers to notify the persons from whom the officers seize the property unless the officers believe those persons are the property's lawful owners. Those individuals may not own the property, but by virtue of possession have colorable claims to the property. In this case, of course, the persons from whom the police seized the property (Matthias and Schurber) owned the seized property.

Second, City Ordinance 34–31 creates a high risk of erroneous deprivation because it does not *require* notification but instead only requires officers to make a "good faith effort" to identify, locate, and notify "lawful owners." The system does not require some other type of notice, e.g., newspaper publication, when officers cannot notify directly all persons with interests in the property.

Third, City Ordinance 34–31 creates a high risk of erroneous deprivation because it neither establishes nor incorporates any guidelines for satisfying its "good faith" requirement or for identifying and locating "lawful owners."[5] The ordinance allows each officer to decide when she has satisfied the good faith requirement. Nothing in the system checks the officer's determination that she cannot notify the owner or need not notify persons with colorable claims.

Additional procedural safeguards such as requiring officers to notify all persons with colorable claims to the property, including those from whom the officers seize the

---

**5.** Section 34–31 specifies the means of notification (in person, by telephone or mail) to the lawful owner. However, the officer gives such

notice only if she actually identifies and locates the lawful owner.

property, would give those persons an opportunity to establish their property interests and to recover their property before the City disposes of it. Detailed directions on how to identify and locate persons with colorable claims and guidelines outlining the steps necessary to satisfy the ordinance's "good faith effort" requirement would also help protect people's property interests by curbing the officers' almost complete discretion under the present system. Formally reviewing officers' decisions and actions before disposing of property also would safeguard individuals' property interests far more than the current system.[6] A third person can determine whether each officer sincerely attempted to notify all persons with colorable claims to the property. Finally, if the City cannot notify persons with colorable claims to the property because it does not know where to reach them and has tried to do so, then the City can at least attempt to safeguard those interests by publishing notice in newspapers most likely to be read by people having claims in the property. Providing some sort of constructive notice, such as newspaper publication, will better protect property interests than the present system of no notification at all. These procedural safeguards allowing more persons to protect their property interests are, of course, valuable.

These additional procedural safeguards would impose only a minimal administrative burden. In many cases, as in this case, the officers already have the names and the addresses of the persons from whom they seized the property. The officers could have easily ascertained the identity of the property owners by "the exercise of the responsible state actor's reasonably diligent efforts." *Small Engine Shop v. Cascio,* 878 F.2d 883, 889 (5th Cir.1989) (citing *Mennonite Board,* 462 U.S. at 800, 103 S.Ct. at 2712). They need only check their own records.

The City has not listed any governmental interests its current system serves that a meaningful notification procedure could not

also serve. The current system altogether fails to strike a reasonable balance between the individual and state interests relevant to due process. Therefore, the City's system violates the Due Process Clause.

### *The City's Responsibility for the Due Process Violations*

■ Despite the glaring constitutional defects in its official policy, the City argues that random and unauthorized action, not a City ordinance or custom, erroneously deprived the plaintiffs' of their property. Therefore, argues the City, it should not be liable for the harm Matthias and Schurber suffered.

*Monell v. Dept. of Social Services of City of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), permits plaintiffs to sue governments under Section 1983 for the harms the governments cause through their statutes, policies, or customs when:

> the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the Section 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other Section 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels. As [ ] Justice Harlan, writing for the Court, said in *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–168 [90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142] (1970): "Congress included customs and usages [in Section 1983] because of the persistent and widespread discriminatory practices of state officials.... Although not authorized by written law, such practices of state officials could well be so permanent

---

**6.** The police department now has someone in the Property & Supply Division sign off on each

Property Disposition Form before the Property & Supply Division disposes of the property.

and well settled as to constitute a 'custom or usage' with the force of law."

*Monell*, 436 U.S. at 690–691, 98 S.Ct. at 2035–2036 (parallel citations and footnotes omitted).

This circuit interpreted the *Monell* municipal liability standard in *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc) (per curiam):

> To promote consistency in the adjudication of the rights of injured persons and the inhabitants of municipalities, the court en banc has agreed on the following formulation to govern the imposition of municipal liability:
>
> > A municipality is liable under Section 1983 for a deprivation of rights protected by the Constitution or federal laws that is inflicted pursuant to official policy.
> >
> > Official policy is:
> >
> > 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policymaking authority; or
> >
> > 2. A persistent, widespread practice of city officials or employees, which, although not authorized by official adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policymaking authority. Actions of officers or employees of a municipality do not render the municipality liable under Section 1983

unless they execute official policy as above defined.

*See also Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir.1984) (en banc) (per curiam).

The plaintiffs challenge the constitutionality of City Ordinance 34–31 and police department practices. Under the prevailing Supreme Court and Fifth Circuit standards discussed above, both the ordinance and police department custom constitute City policy for which the City clearly is responsible.

Without a doubt, the City ordinance constitutes City policy for which the City is liable. Therefore, the City is responsible for the constitutional defects in the ordinance. Likewise, the persistent, widespread, and longstanding practices of police officers constitute policy for which the City is responsible. These practices reduce rather than increase the possibility of notice. They include failure to notify persons with colorable claims to the property and attempting notification of "lawful owners" "once or twice, maybe not at all." Uncontradicted testimony in the record amply supports the conclusion that these practices are "so common and well settled as to constitute a custom that fairly represents municipal policy." *Webster*, 735 F.2d at 841. Given the persistent, widespread, and longstanding nature of these practices, the jury easily could find that the police chief actually or constructively knew about them. The City delegated full responsibility for disposing of the property to the police chief.[7,8] Therefore, the City bears responsibility for these practices because they "fairly represent municipal policy." *Id.*

Even though *Monell* clearly holds the City liable for the harms caused here, the City argues that *Parratt v. Taylor*, 451

---

7. Section 34–30. *Disposal of abandoned property by chief of police.*
The chief of police is hereby authorized, in the manner described hereinbelow [in Ordinance 34–31], to dispose of all abandoned property which has been in the possession of the police department for a period of not less than ninety (90) days.

Code 1968, Section 35–15.1; Ord. No. 77–561; Section 3, 3–16–77.

8. *See also Haitian Refugee Center v. Smith*, 676 F.2d 1023, 1029–1040 (5th Cir.1982) (balanced the *Eldridge* factors and found that the plaintiffs constitutionally due more process than they received).

U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) insulates it from liability in this case because a random, unauthorized act (the failure to properly complete a Property Disposition Form) caused the plaintiffs' injuries. We believe the City cites the wrong case. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), not *Parratt*, applies here.

In *Parratt*, a prisoner alleged that the government violated his due process rights by negligently losing a hobby kit he had ordered. In such a case, the Court reasoned, the state could not predict when the loss would occur; could not control the random activity causing the loss; and could not provide a meaningful predeprivation hearing. *Parratt*, 451 U.S. at 541, 101 S.Ct. at 1916. As a result, the Court concluded, an adequate postdeprivation remedy for negligent deprivation of property satisfies the Due Process Clause.[9]

In *Logan*, a discharged employee (Logan) filed an unlawful termination charge with the Illinois Fair Employment Practices Commission. The Commission inadvertently failed to schedule a required hearing within the allotted time period. The Illinois Supreme Court held that the error deprived Logan of his cause of action. The Supreme Court disagreed. The Court focused on the entire claim-processing system to determine whether it complied with constitutional requirements of fair procedure. The Court held that a *state* "may not finally destroy a property interest [the employee's right to use the Commission procedures] without first giving the putative owner an opportunity to present his claim of entitlement." *Logan*, 455 U.S. at 434, 102 S.Ct. at 1157.

Zimmerman Brush Company, the employer, argued that Logan complained of essentially the same type of *negligent* deprivation as that found in *Parratt* and therefore

should be limited to the tort remedies provided by state statute. The Court responded:

> This argument misses *Parratt's* point. In *Parratt*, the Court emphasized that it was dealing with "a tortious loss of ... property as a result of a random and unauthorized act by a state employee ... not a result of some established state procedure." *Parratt*, 451 U.S. at 541 [101 S.Ct. at 1916]. Here, in contrast, it is the state system itself that destroys a complainant's property interest, by operation of law, whenever the Commission fails to convene a timely conference—*whether the Commission's action is taken though negligence, maliciousness, or otherwise. Parratt* was not designed to reach such a situation. *See id.*, at 545 [101 S.Ct. at 1918] (second concurring opinion). Unlike the complainant in *Parratt*, Logan is challenging not the Commission's error, but the "established state procedure" that destroys his entitlement without according him proper procedural safeguards.

*Logan*, 455 U.S. at 435–436, 102 S.Ct. at 1157–1158 (parallel citations omitted) (emphasis added). The *Logan* Court continued:

> In any event, the Court's decisions suggest that, absent "the necessity of quick action by the State or the impracticality of providing any predeprivation process," a postdeprivation hearing here would be constitutionally inadequate.

*Logan*, 455 U.S. at 436, 102 S.Ct. at 1158 citing *Parratt*, 451 U.S. at 539, 101 S.Ct. at 1914–1915, *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 19–20, 98 S.Ct. 1554, 1565–1566, 56 L.Ed.2d 30 (1978); *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 570, n. 7, 92 S.Ct. 2701,

---

**9.** In *Daniels v. Williams*, 474 U.S. 327, 330–331, 106 S.Ct. 662, 664–665, 88 L.Ed.2d 662 (1986) the Court overruled part of *Parratt*. The Court held that the negligent conduct is not "deprivation" and therefore cannot be the basis for a due process claim. In *Davidson v. Cannon*, 474 U.S.

344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), the companion case to *Daniels*, the Court held that prison official's failure to protect a prisoner from assault was negligent and did not amount to a due process violation.

2705, n. 7, 33 L.Ed.2d 548 (1972); *Bell v. Burson*, 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90 (1971); *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 786–787, 28 L.Ed.2d 113 (1971); and comparing *Barry v. Barchi*, 443 U.S. 55, 64–65, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365 (1979) and *Eldridge*, 424 U.S. at 343–347, 96 S.Ct. at 907–909. This is "particularly true where, as here, the State's only post-termination process comes in the form of an independent tort action." *Logan*, 455 U.S. at 436, 102 S.Ct. at 1158 (footnote omitted).

In *Hudson v. Palmer*, 468 U.S. 517, 534, 104 S.Ct. 3194, 3204, 82 L.Ed.2d 393 (1984) (extending *Parratt* to intentional acts), the Court characterized the "controlling inquiry" under *Parratt* as "solely whether the state is in a position to provide for predeprivation process." The Court reiterated that "[t]he underlying rationale of *Parratt* is that when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur." *Hudson*, 468 U.S. at 533, 104 S.Ct. at 3203.

The Court then reviewed *Logan:*

> In *Logan*, we decided a question about which our decision in *Parratt* left little doubt, that is, whether a postdeprivation state remedy satisfies due process where the property deprivation is effected pursuant to an established state procedure. We held that it does not.

*Hudson*, 468 U.S. at 534, 104 S.Ct. at 3204. The Court concluded that *Logan* did not apply in *Hudson* because the "[r]espondent does not even allege that the asserted destruction of his property occurred pursuant to a state procedure." *Hudson*, 468 U.S. at 534, 104 S.Ct. at 3204.

After *Hudson*, the Court reemphasized that *Parratt* does not extend to *Logan*-type cases "in which the deprivation of property is effected pursuant to an established state policy or procedure, and the State could provide predeprivation process." *Williamson Co. Regional Planning v. Hamilton Bank*, 473 U.S. 172, 195 n. 14, 105 S.Ct. 3108, 3121 n. 14, 87 L.Ed.2d 126 (1985) (citations omitted).

Recently, the Court re-emphasized *Parratt's* restricted scope. In *Zinermon v. Burch*, —— U.S. ——, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), Burch sued the petitioners for violating his due process rights. The petitioners admitted Burch to a mental hospital as a "voluntary patient" even though Burch could not knowingly consent to admission. The petitioners did not initiate the state's involuntary placement procedure for persons incapable of knowingly consenting to admission. That procedure provided constitutional safeguards. The Court refused to apply *Parratt* because (1) the petitioners could predict the deprivation; (2) the petitioners could provide a predeprivation hearing; and (3) the petitioners' actions were authorized because the state delegated to the petitioners the power to admit patients and to initiate the state's procedural safeguards. The Court emphasized that *Parratt* "is not an exception to the *Mathews* balancing test but rather an application of that test to the unusual case in which one of the variables in the *Mathews* equation—the value of predeprivation safeguards—is negligible in preventing the kind of deprivation at issue." *Zinermon*, —— U.S. at ——, 110 S.Ct. at 985. *Parratt* applies *only* in those cases.

As our review of *Zinermon* makes clear, this case falls under *Logan* rather than *Parratt*. First, Matthias and Schurber challenge the City's system that permits disposition of people's property without any notification at all. They allege that the disposition of their property "occurred pursuant to a [City] procedure [the ordinance and police department custom]." *See Hudson*, 468 U.S. at 534, 104 S.Ct. at 3204, *Logan*, 455 U.S. at 435–436, 102 S.Ct. at 1157–1158. They do not complain about

the failure to properly process the Property Disposition Form. *See id.* Instead, they challenge "the 'established state procedure' that destroys [their] entitlement without according [them] proper procedural safeguards." *Delahoussaye v. Seale,* 788 F.2d 1091, 1094–1095 (5th Cir.1986) (quoting *Logan,* 455 U.S. at 429, 102 S.Ct. at 1154) (rejects applying *Parratt* because the random and unauthorized acts of state employees did not cause the deprivation).

Second, the City can easily provide the notice and opportunity to be heard that the Due Process Clause requires *before* depriving individuals of their property. *See Zinermon,* — U.S. —, 110 S.Ct. 975; *Williamson Co.,* 473 U.S. at 195, n. 14, 105 S.Ct. at 3121, n. 14. No necessity for quick action exists. *See Logan,* 455 U.S. at 436, 102 S.Ct. at 1158. When a government can provide a predeprivation hearing, the availability of a postdeprivation tort remedy does not satisfy the Due Process Clause. *Zinermon,* — U.S. —, 110 S.Ct. 975; *Augustine v. Doe,* 740 F.2d 322, 327–328 (5th Cir.1984). *Parratt* applies *only* when

that state cannot feasibly provide predeprivation procedural safeguards. *Zinermon,* — U.S. —, 110 S.Ct. 975; *Augustine,* 740 F.2d at 329. As in *Zinermon* and *Augustine,* the City could easily provide predeprivation notice and hearing here.

In *Findeisen,* 749 F.2d at 236–239, we found that a tenured schoolteacher's (Findeisen's) alleged constructive discharge claim set forth the type of property deprivation that requires a predeprivation hearing. Due process requires a predeprivation hearing because (1) a pretermination hearing is necessary to assure the state's statutory guidelines are followed; (2) the discharge affects Findeisen's professional standing and livelihood; (3) no necessity for hasty action exists; and (4) absent an emergency, a school board can easily hold a meaningful predeprivation hearing to properly consider whether to discharge a tenured teacher. *Findeisen,* 749 F.2d at 239. In this case, the City's actions affected the plaintiffs' personal possessions, no necessity for hasty action exists, and the City can easily hold a meaningful postdeprivation hearing.[10]

---

**10.** On the other hand, we have held that postdeprivation remedies satisfy due process. For example, in *Gamble v. Webb,* 806 F.2d 1258 (1986) (*per curiam*), we found a postdeprivation remedy satisfactory. In *Gamble,* the racing commission notified Gamble that it found a discrepancy in his application. The racing stewards gave him an " 'opportunity to present his side of the story' before the suspension." *Gamble,* 806 F.2d at 1262. They then temporarily suspended Gamble's racing license pending a hearing within eight days. We weighed the following factors: the plaintiff's substantial interest in his horse owner's license; the temporary nature of the suspension (effective only pending a hearing that was available in this case eight days after the date of the suspension, and within three days of Gamble's request); the fact that suspension did not come out of thin air; the low risk of governmental error; and the State's considerable interest in maintaining the integrity of horse racing in Louisiana. We agreed with the district court's conclusion that "when the owner's interest is balanced against the need to maintain the integrity of horse racing, the swiftness of the administrative determination, the indicia of reliability, and the informal notice which plaintiff received, ... a pre-hearing suspension pending appearance before the stewards does not violate the Fourteenth Amend-

ment." *Gamble,* 806 F.2d at 1262 (quoting district court's memorandum opinion at 16). *See also Hatteras v. Southwestern Bell Telephone Co.,* 774 F.2d 1341, 1343–1344 (5th Cir.1985) (no due process violation even though property essential to the plaintiff's business, because of the weight of the government's interest in protecting its citizenry from ongoing criminal activity).

We reach a different answer if we weigh the *Gamble* factors in this case. Like Gamble, the plaintiffs here have a substantial interest in their property. But unlike the temporary suspension in *Gamble,* the sale in this case *permanently* deprived the plaintiffs of their property, much which cannot be replaced. Unlike *Gamble,* the disposition did come out of thin air. The City never told the plaintiffs it intended to dispose of their property, nor did it give them an opportunity to present their side of the story. Unlike *Gamble,* the risk of governmental error here is high—as this case so aptly illustrates. And finally, unlike *Gamble,* the state has not advanced any substantial interest served by its current system.

In *Delahoussaye,* we held that postdeprivation remedies satisfied due process because (1) the state needed to seize warehouse quickly to protect the economic wellbeing of farmers; (2) the deprivation was only temporary; (3) the seizure did not appear to substantially interfere with

Third, the plaintiffs' only post-termination process comes in an independent legal action. *See Logan*, 455 U.S. at 436, 102 S.Ct. at 1158. Finally, the rationale of *Parratt* (that the state cannot anticipate random and unauthorized actions) does not apply when the challenged actions comply with City policy. *Hudson*, 468 U.S. at 533, 104 S.Ct. at 3203–3204. Therefore, a post-deprivation proceeding under *Parratt* does not shield the City from liability for its policies that deprived the plaintiffs of notice and an opportunity to be heard.

In fact, this case involves a systemic problem *far more* constitutionally problematic than that in *Logan*. In *Logan*, had the system worked correctly and no error occurred, the Commission's actions would not violate the Due Process Clause. But here, even if every City employee strictly complies with the City's system for processing seized property, (as it did with batch 5–518–1) the system itself still blatantly violates the Due Process Clause. Thus, if the system in *Logan* could not pass due process muster, the City's system here *certainly* cannot.

We understand that the City did not fully comply with its procedures when it disposed of the property in batch 5–539–7 without an officer's authorization. Nevertheless, this error does not convert a *Logan* case to a *Parratt* case. The plaintiffs challenge the City's ordinance and customs permitting disposal of property without notice or a hearing at any time, not the City's error in processing batch 5–539–7. The City's processing error does not excuse the City from its liability for failing to give notice and an opportunity to be heard. Instead, the error merely illustrates how inadequately the City's ordinances and procedures protect individuals' property interests. *See Zinermon*, — U.S. —, 110 S.Ct. 975.

Based on our review of Supreme Court and Fifth Circuit precedent, we do not believe that *Parratt* protects the City from its failure to give Matthias and Schurber notice and an opportunity to be heard before disposing of their property. We have reviewed carefully the City's other complaints of error and find none. Therefore, we AFFIRM.

EDITH H. JONES, Circuit Judge, specially concurring:

Unlike my colleagues, I do not find the applicable city regulations *blatantly* violative of due process, nor am I confident that plaintiffs proved a municipal custom that consists essentially of ignoring the regulations and failing to give notice to lawful owners of property seized by the police. I am constrained to concur, however, solely because I read the Supreme Court's recent decision in *Zinermon v. Burch*, — U.S. —, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), as holding that we must take a hard look at accidental deprivations of liberty or property to determine whether additional procedural safeguards would have alleviated the problem. Although the majority's prescriptions go too far in "safeguarding" the rights of those who in most cases will not be lawful owners of seized property, I agree that some minor adjustments of the city's regulations would have protected the property of Matthias and Bingley. Under *Zinermon*, therefore, they are entitled to recover.

the warehouse's operations; (4) and the state statute required a postdeprivation hearing within ten days of the suspension. *Delahoussaye*, 788 F.2d at 1095. Here no need for quick action exists, the deprivation was permanent, it substantially interfered with the plaintiffs' lives, and the City does not provide a postdeprivation hearing.