# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2538

_____

| | |
|---|---|
| Henry Szabla, | * |
| | * |
| Appellant, | * |
| | * |
| v. | * |
| | * |
| City of Brooklyn Park, Minnesota, a | * |
| Minnesota municipality; City of | * |
| Crystal, Minnesota, a Minnesota | * Appeal from the United States |
| municipality; Steven Baker, a canine | * District Court for the |
| officer of the of City of Brooklyn Park, | * District of Minnesota. |
| individually, and in his official | * |
| capacity as a Police Officer of the City | * |
| of Brooklyn Park; Officer Justin | * |
| Tourville; Sgt. Stephen Holm, | * |
| individually, and in their official | * |
| capacities as Police Officers of the | * |
| City of Crystal, | * |
| | * |
| Appellees. | * |

_____

Submitted: April 18, 2006
Filed: May 18, 2007

_____

Before LOKEN, Chief Judge, JOHN R. GIBSON, WOLLMAN, ARNOLD, MURPHY, BYE, RILEY, MELLOY, SMITH, COLLOTON, GRUENDER, and BENTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Henry Szabla appeals the district court's[1] grant of summary judgment in favor of the appellees on his claims brought pursuant to 42 U.S.C. § 1983 and Minnesota law. A panel of this court affirmed the dismissal of most claims, but reversed the district court's grant of summary judgment on Szabla's claim for municipal liability against the City of Brooklyn Park, Minnesota. *Szabla v. City of Brooklyn Park*, 429 F.3d 1168 (8th Cir. 2005). We granted the City's petition for rehearing *en banc* limited to the question of Brooklyn Park's municipal liability, and we now affirm that portion of the judgment as well.

I.

At about 1:20 a.m. on August 17, 2000, police officers from the City of Crystal, Minnesota, responded to a report that an automobile had struck a tree near Becker Park. The officers found the car, which had been abandoned, and they saw that the car's windshield had been shattered and there was an imprint where a person's head had struck the windshield. The officers called the registered owner of the car, who said he had previously sold it. The officers then began to search for the driver, and one of the officers determined that assistance from a police canine would help to find the driver. The Crystal Police Department did not have a canine unit, so the officers requested assistance from the City of Brooklyn Park. Brooklyn Park dispatched one of its canines, Rafco, with his handler, Officer Steven Baker, to the scene.

When Baker and Rafco arrived at the abandoned car, Baker discovered a screwdriver, which he thought could have been used as a burglary tool or weapon, and observed "property" in the back seat of the car, which Baker believed could have been the fruits of a burglary. Baker testified that because officers did not know whether they were looking for a criminal suspect or an innocent injured person, he gave Rafco

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

the command to "track," which is the command for Rafco to apprehend or bite the individual he is tracking. Baker said that he chose not to give Rafco the command to "search," a command that directs the dog to refrain from biting a person, because he was concerned about officer safety in the event the dog led him to a criminal suspect.

Baker began to search Becker Park once Rafco acquired a scent emanating from the crashed automobile. Baker had Rafco on a fifteen-foot leash, but provided the canine with only about a six-foot lead. He did not shout a warning that a police dog was in the area. Rafco led Baker through the park to a shelter within the park. Once Rafco entered the shelter, he bit Szabla, who had been asleep in the shelter. (Szabla slept in the park, which closed at 11 p.m., because it was across the street from a temporary employment agency that hired workers on a daily basis). Szabla kicked Rafco off, and Rafco bit Szabla a second time. Baker ordered Szabla to show his hands, and Baker instructed Rafco to release Szabla once he complied with the order. The Crystal officers arrived moments later, and they temporarily arrested Szabla. The officers released Szabla within two minutes, after verifying that he was not involved in the automobile accident. Szabla testified that when the officers were walking away, he heard one of them say, "I gave the dog too much leash." Szabla reported that he suffered 23 punctures on his legs and hip.

Szabla brought this action pursuant to 42 U.S.C. § 1983 and Minnesota state law against the cities of Crystal and Brooklyn Park, as well as the individual officers involved. The district court granted the defendants' motions for summary judgment. The district court concluded that Baker had used excessive force against Szabla, in violation of Szabla's Fourth Amendment rights, by commanding Rafco to "track," or bite and hold, without first providing a warning. The court held, however, that Baker was protected by qualified immunity, because the right to a warning was not clearly established at the time of the incident. The court also dismissed Szabla's claims arising under § 1983 against the Crystal police officers and the City of Crystal, as well as Szabla's claims under Minnesota law against all of the defendants. A panel of our

-3-

court affirmed the judgment of the district court on each of these claims, *Szabla*, 429 F.3d at 1173-75, 1176-77, and they are not within the scope of this rehearing.

Szabla also raised a claim of municipal liability under § 1983 against the City of Brooklyn Park. The district court held that Szabla failed to specify which of Brooklyn Park's policies was allegedly unconstitutional, and ruled that the "isolated incident" of Rafco biting Szabla could not support a claim that the City acted with deliberate indifference by failing adequately to train its officers. The district court concluded that Szabla had not raised an argument, comparable to that discussed in *Kuha v. City of Minnetonka*, 365 F.3d 590, 603-07 (8th Cir. 2004), that the City was liable for adopting a policy that authorized police officers to use a canine to bite and hold a suspect, but did not mandate that the officer give an advance warning. A panel of our court concluded that Szabla had adequately raised a claim based on *Kuha* in the district court, and held that he presented sufficient evidence to overcome Brooklyn Park's motion for summary judgment. 429 F.3d at 1175-76. We granted rehearing *en banc* to consider the merits of this claim for municipal liability.

## II.

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that a municipality is a "person" that can be liable under § 1983. *Id.* at 690. At the same time, the Court concluded that a municipality may not be found liable "unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691. The Court did not address the full contours of municipal liability under § 1983, but established that a

municipality cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor. *Id.*

*Monell* was a case where the city's policy was itself unconstitutional. The policy compelled a constitutional violation by requiring pregnant female employees to take unpaid leaves of absence before their absences from work were medically necessary. *See Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632 (1974). The potential for municipal liability in that situation is well established, because a constitutional violation flows directly from a policymaker's deliberate choice reflected in an official policy or action. *E.g.*, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 484-85 (1986); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 251-52 (1981); *Owen v. City of Independence*, 445 U.S. 622, 627-29, 633 & n.13 (1980). "Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving [the] issues of fault and causation is straightforward." *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 404-05 (1997). To establish a constitutional violation, no evidence is needed other than a statement of the municipal policy and its exercise. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985) (plurality opinion).

But where an official policy is lawful on its face and does not compel unconstitutional action by an employee of the municipality, the analysis is different. As a plurality of the Court remarked in *Tuttle*, "[o]bviously, if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost any such harm inflicted by a municipal official." *Id.* at 823 (plurality opinion). Accordingly, "some limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional, or the test set out in *Monell* [foreclosing *respondeat superior* liability] will become a dead letter." *Id.*

The appropriate limitation was addressed in *City of Canton v. Harris*, 489 U.S. 378 (1989), which involved an allegation that constitutional violations resulted from

a municipality's failure adequately to train its police force. The Court explained that "'[m]unicipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers." *Id*. at 389 (quoting *Pembaur*, 475 U.S. at 483-84 (plurality opinion)). Where a policy is constitutional on its face, but it is asserted that a municipality should have done more to prevent constitutional violations by its employees, a plaintiff must establish the existence of a "policy" by demonstrating that the inadequacies were a product of deliberate or conscious choice by policymakers. *Id*. The standard of fault in that situation is "deliberate indifference" to constitutional rights. *Id*. at 388. "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Brown*, 520 U.S. at 405. "[A] plaintiff seeking to establish municipal liability on the theory that a *facially lawful* municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Id*. at 407 (emphasis added). Thus, only where a municipality's failure to adopt adequate safeguards was the product of deliberate indifference to the constitutional rights of its inhabitants will the municipality be liable for an unconstitutional policy under § 1983. *Id.* at 406-07; *see also City of Canton*, 489 U.S. at 391-92; *id*. at 394-96 (O'Connor, J., concurring in part and dissenting in part); *Gonzalez v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 757 (5th Cir. 1993) ("The circuits have uniformly interpreted *Canton*'s 'deliberate indifference' requirement, announced in the context of a 'failure to train' claim, to apply to all cases involving facially constitutional policies.").

Our court has long followed this approach. In *Dick v. Watonwan County*, 738 F.2d 939 (8th Cir. 1984), we held that where a municipality adopted a policy that left discretion to individual officials, two of whom later acted unconstitutionally, the policy did not give rise to liability under § 1983. *Id*. at 943. We explained that

because the policy did not "affirmatively sanction" unconstitutional actions, it was not an unconstitutional policy, and it could not be the "moving force" of any constitutional violation. *Id*. We said that the municipality's governing board "might have chosen to adopt more detailed guidelines, and such rules might have averted the mistake that was made in this case," but the board's decision to rely on the judgment of its employees was "certainly not unconstitutional in and of itself." *Id*. at 942. In *Patzner v. Burkett*, 779 F.2d 1363 (8th Cir. 1985), we reiterated that a plaintiff asserting municipal liability "must show not only that a policy or custom existed, and that it was causally related to the plaintiff's injury, *but that the policy itself was unconstitutional*." *Id*. at 1367 (emphasis added). We have continued to apply this reasoning more recently in *Golberg v. Hennepin County*, 417 F.3d 808, 812 (8th Cir. 2005), which implemented the Supreme Court's guidance in *Brown* and *City of Canton*. Because each of these cases involved a municipal policy that was facially lawful, we analyzed the sufficiency of the claims under the "deliberate indifference" standard of fault first adopted by our court in *Herrera v. Valentine*, 653 F.2d 1220, 1224 (8th Cir. 1981), and ultimately endorsed by the Supreme Court in *City of Canton*. *Golberg*, 417 F.3d at 812; *Patzner*, 779 F.2d at 1367; *Dick*, 738 F.2d at 943. *Accord Pietrafeso v. Lawrence County*, 452 F.3d 978, 982 (8th Cir. 2006) ("A county is liable if an action or policy itself violated federal law, or if the action or policy was lawful on its face but led an employee to violate a plaintiff's rights [and] was taken with 'deliberate indifference' as to its known or obvious consequences.") (internal quotation omitted); *Audio Odyssey, Ltd. v. Brenton First Nat'l Bank*, 245 F.3d 721, 742 (8th Cir. 2001) ("[T]he 'policy' of using 'Directions to the Sheriff' forms is not itself unconstitutional, as an express policy or affirmative custom must be to create municipal liability"), *judgment vacated & opinion reinstated in relevant part by* 286 F.3d 498 (8th Cir. 2002) (en banc).

Applying these standards to Szabla's claim, we conclude that the City of Brooklyn Park was entitled to summary judgment on the claim of municipal liability. Brooklyn Park's written policy concerning the use of dogs is lawful on its face.

Directive 331, promulgated by the chief of police, permits the use of canines in five circumstances, including "in arresting known dangerous criminals who will, or might offer physical resistance to the arresting officer or who might attempt to flee or escape custody," and "in search and apprehension work for" criminals and suspects who might pose a risk to other citizens. (App. at 464). We assume that employment of canines in "arresting known dangerous criminals" or in "apprehension work" will sometimes involve using a dog to bite and hold a suspect, but it is not unconstitutional to use dogs for those purposes. Directive 331 also recognizes that the "use of police dogs may constitute the use of force," (*id*. at 461), but provides that "[u]se of police dogs shall be in accordance with use of force statutes and Department Policy," (*id*. at 464), and another policy, Directive 333, expressly forbids a police officer to use "unreasonable, unnecessary or unlawful force." (*Id*. at 466). These policies as written are not unconstitutional.

A constitutional problem may arise based on *the manner* in which the canines are used. We held in 2004 that "a jury could properly find it objectively unreasonable to use a police dog trained in the bite and hold method without first giving the suspect a warning and opportunity for peaceful surrender." *Kuha*, 365 F.3d at 598. Our grant of rehearing in this case was limited to the issues of municipal liability raised in Brooklyn Park's petition for rehearing, *see* Order (Feb. 23, 2006), so we accept *Kuha*'s Fourth Amendment holding for purposes of analysis, and assume there is a submissible case that Officer Baker was required to give a warning before using his police dog to bite and hold. *See Szabla*, 429 F.3d at 1173 (panel opinion). But even so, Brooklyn Park's directives do not affirmatively sanction the use of the dogs in an unconstitutional manner. The policy is simply silent concerning the circumstances under which an officer should provide a warning before a canine is directed to bite and

hold a suspect. The directives do not reflect a deliberate choice by policymakers to refrain from warning citizens about the use of dogs.[2]

Indeed, Szabla's principal contention has been that the City's "*failure to have a policy*" giving guidance on the use of canines "foster[ed] the use of excessive force," and thus amounted to a constitutional violation. (Br. of Appellant at 26) (emphasis added). As we have explained, however, a written policy that is facially constitutional, but fails to give detailed guidance that might have averted a constitutional violation by an employee, does not itself give rise to municipal liability. There is still potential for municipal liability based on a policy in that situation, but only where a city's inaction reflects a deliberate indifference to the constitutional rights of the citizenry, such that inadequate training or supervision actually represents the city's "policy."[3]

---

[2]Authorities from other circuits cited by the dissent are not inconsistent with our conclusion, because they involve instances in which a municipality affirmatively sanctioned unconstitutional conduct by its employees. The city in *Garner v. Memphis Police Dep't*, 8 F.3d 358 (6th Cir. 1993), affirmatively "taught Officer Hymon that it was proper to shoot a fleeing burglary suspect in order to prevent escape." *Id*. at 364. The city in *O'Brien v. City of Grand Rapids*, 23 F.3d 990 (6th Cir. 1994), adopted an official policy to follow the teachings of an expert consultant who trained police officers that search warrants were *not* required in "critical incidents," although the Fourth Amendment did require warrants. *Id*. at 1004. The city in *Matthias v. Bingley*, 906 F.2d 1047 (5th Cir. 1990), engaged in "persistent, widespread, and longstanding practices" that violated constitutional rights and constituted "a custom that fairly represent[ed] municipal policy." *Id*. at 1054. The city's policy in *Kostrzewa v. City of Troy*, 247 F.3d 633, 645 (6th Cir. 2001), allegedly required police officers to apply handcuffs to all detainees, even when the handcuffs necessarily caused severe pain and risk of injury. And the county in *Tardiff v. Knox County*, 397 F. Supp. 2d 115, 131 (D. Me. 2005), implemented a policy requiring employees to strip-search all felony detainees, even when such a search was constitutionally unreasonable.

[3]The separate doctrine providing for municipal liability in a case of widespread unconstitutional practices that constitute a "custom or usage with the force of law" is

The evidence presented on this record is insufficient to make a submissible case of deliberate indifference. The evidence does not show that Brooklyn Park had a history of police officers unreasonably using canines to apprehend suspects without advance warning, such that the need for additional training or supervision was plain. *See Brown*, 520 U.S. at 407-08; *City of Canton*, 489 U.S. at 390 & n.10. So far as the record reveals, this was a one-time incident, and there is no evidence of a pattern of constitutional violations making it "obvious" that additional training or safeguards were necessary. *Id*. at 390 & n.10; *see also id*. at 397 (O'Connor, J., concurring in part and dissenting in part). We agree with the district court that this "isolated incident" cannot support a claim that the City acted with deliberate indifference by inadequately training its officers on the use of canines. *See Dick*, 738 F.2d at 943; *see also Brown*, 520 U.S. at 408.

The Supreme Court has not foreclosed the possibility that a single violation of constitutional rights could trigger municipal liability, where the violation is accompanied by a showing that the municipality had "failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Brown*, 520 U.S. at 409. In determining whether the need for training or other safeguards was "obvious," however, we look to whether the employee violated a "clear constitutional duty" and whether there were "clear constitutional guideposts" for municipalities in the area. *City of Canton*, 489 U.S. at 396-97 (O'Connor, J., concurring in part and dissenting in part). Clarity of the municipal obligation is important in this context, because "[w]ithout some form of notice to the city, and the opportunity to conform to constitutional dictates both what it does and what it chooses not to do, the failure to train theory of liability could completely engulf *Monell*, imposing liability without regard to fault." *Id*. at 395. *See Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997) ("A municipality would thus evince a

---

not at issue in this case. *See McMillian v. Monroe County*, 520 U.S. 781, 796 (1997); *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion).

deliberate indifference to the constitutional rights of its citizens by failing to train its employees with respect to a *clear constitutional duty* implicated in recurrent situations that a particular employee is certain to face.") (emphasis added) (internal quotation omitted); *Young v. City of Augusta*, 59 F.3d 1160, 1172 (11th Cir. 1995) ("[T]he need for a particular type of training may be obvious where jailers face *clear constitutional duties* in recurrent situations.") (emphasis added); *Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87, 94 n.10 (1st Cir. 1994) (observing that because there were "no *clear constitutional guideposts* as to the precise nature of the obligations that the Due Process Clause places upon the police . . ., it is difficult to conclude that the failure to train officers to recognize the need for medical treatment in the first instance, in and of itself, reflects callous or reckless indifference to constitutional rights.") (emphasis added).

In this case, a constitutional requirement that an officer in Baker's situation give advance warning before commanding a canine to bite and hold a suspect was not clearly established as of August 2000. *See Kuha*, 365 F.3d at 602. The need for training or other safeguards relating to warnings, therefore, was not so obvious at the time of this incident that Brooklyn Park's actions can properly be characterized as deliberate indifference to Szabla's constitutional rights. While a municipality does not enjoy qualified immunity from damages liability that results from a policy that is itself unconstitutional or from an unconstitutional decision by municipal policymakers, *Owen*, 445 U.S. at 638, we agree with the Second Circuit and several district courts that a municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established. *Townes v. City of New York*, 176 F.3d 138, 143-44 (2d Cir. 1999); *Young v. County of Fulton*, 160 F.3d 899, 904 (2d Cir. 1998); *accord Williamson v. City of Virginia Beach*, 786 F. Supp. 1238, 1264-65 (E.D. Va. 1992), *aff'd*, No. 92-1420, 1993 WL 127961 (4th Cir. Apr. 16, 1993) (unpublished) (per curiam); *Watson v. Sexton*, 755 F. Supp. 583, 588 (S.D.N.Y. 1991); *Zwalesky v. Manistee County*, 749 F. Supp. 815, 820 (W.D. Mich. 1990).

This conclusion is not inconsistent with the Supreme Court's decisions in *Owen* and *Pembaur*, *cf. post*, at 28, because neither of those cases involved an alleged municipal policy of deliberate indifference. In *Owen*, municipal liability was based on official conduct of the city's lawmakers, which amounted to "official policy" causing an infringement of constitutional rights. 445 U.S. at 633. In *Pembaur*, the county was liable because the county prosecutor established county policy and ordered the sheriff to take an action that violated the constitutional rights of the plaintiff. 475 U.S. at 485. In other words, the municipality was liable in each case because a particular municipal action *itself* violated federal law. Fault and causation were obvious in each case. *See Brown*, 520 U.S. at 404-06.

Where the municipality has not directly inflicted an injury, however, "rigorous standards of culpability and causation must be applied," *id*. at 405, and a showing of deliberate indifference is required. The absence of clearly established constitutional rights – what Justice O'Connor called "clear constitutional guideposts," 489 U.S. at 397 – undermines the assertion that a municipality *deliberately* ignored an *obvious* need for additional safeguards to augment its facially constitutional policy. This is not an application of qualified immunity for liability flowing from an unconstitutional policy. Rather, the lack of clarity in the law precludes a finding that the municipality had an unconstitutional policy at all, because its policymakers cannot properly be said to have exhibited a policy of *deliberate* indifference to constitutional rights that were not clearly established.[4]

---

[4]That the Supreme Court in *City of Canton* remanded the case for further proceedings does not mean the Court rejected Justice O'Connor's view that clear constitutional duties and guideposts are vital to a showing of deliberate indifference. *Cf. post*, at 29. While the precise obligations of city employees to pre-trial detainees under the Due Process Clause were unsettled when *City of Canton* was decided, it was clearly established that a detainee was entitled to protections *at least* as great as those available to convicted prisoners under the Eighth Amendment. *Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). The Court relied on a concession by the city, for purposes of the decision, that its employees had violated the plaintiff's constitutional

-12-

Finally, Szabla's deliberate indifference claim also fails for lack of causation. *See City of Canton*, 489 U.S. at 391.  Our colloquy at oral argument with Szabla's counsel highlighted that the shortcoming in municipal policy that Szabla alleges could not have caused the injury in this case.  Szabla's claim is that Fourth and Fourteenth Amendments require the City to have a policy mandating a warning whenever a canine is "deployed" by release from a leash or the physical control of an officer.  He argues that the City was deliberately indifferent to his constitutional rights when it failed to adopt such a policy.  Even assuming that were so, it is conceded that in this case, Officer Baker never deployed the canine in the sense described.  The dog remained on its leash during the entire episode, and the injury to Szabla occurred because Baker failed to maintain proper control of the dog while it was leashed, not because the dog was "deployed" without a warning.

Notwithstanding the foregoing, Szabla contends that the municipal liability analysis of our decision in *Kuha* demonstrates that he has presented a submissible claim against Brooklyn Park.  *Kuha* reasoned that because the plaintiff had alleged that his constitutional rights were violated "by an action taken pursuant to an official municipal policy (as opposed to a failure to train, for instance)," he was not required to demonstrate that the city was deliberately indifferent to his constitutional rights. 365 F.3d at 605.  We observed that the chief of police had testified that the use of a

rights under the Eighth Amendment's clearly-established "deliberate indifference" standard, so the absence of clear constitutional duties and guideposts was not a basis for directing entry of judgment as a matter of law.  *City of Canton*, 489 U.S. at 388-89 n.8 ("[W]e must assume that respondent's constitutional right to receive medical care was denied by city employees – whatever the nature of that right might be."); Tr. of Oral Arg. at 9, *City of Canton*, 1988 U.S. Trans. LEXIS 119 ("[W]e had to take it as a given that there was deliberate indifference [on the part of individual officers]").  As noted, consistent with our view, a number of circuits have focused on the existence of "clear constitutional duties" or "clear constitutional guideposts" when applying *City of Canton*.  *Robles*, 113 F.3d at 735; *Young*, 59 F.3d at 1172; *Febus-Rodriguez*, 14 F.3d at 94 n.10.

canine without advance warning to apprehend Kuha was "in accordance with Department policy." *Id*. at 606. The opinion concluded that if a jury determined that the canine handler acted unreasonably by failing to give a verbal warning before using a police dog trained to bite and hold a suspect, then "the jury can also reasonably conclude that the City's policy on police dogs – which authorizes the use of dogs trained only to bite and hold, and which did not mandate a verbal warning in this scenario – caused the constitutional violation." *Id*. at 607. Our decision allowed that if the city could establish that its written policies did, in fact, require warnings before the use of a canine trained only to bite and hold, then the city would not be liable. *Id*.

A case can be made that *Kuha* is distinguishable on its facts, *see* 429 F.3d at 1178 (dissenting opinion), but we think the more fundamental difficulty with Szabla's reliance on *Kuha* is that the analysis of municipal liability in that case deviates in some respects from the principles we have outlined above. Rather than consider whether the city's policy affirmatively sanctioned an unconstitutional practice by directing or compelling officers to use canines to bite and hold without advance warning, the *Kuha* opinion appeared to place the burden on the city to demonstrate that it had adopted a policy that affirmatively required the officer in that scenario to give a warning. Instead of asking whether the city made a deliberate choice to proceed in a manner that was unconstitutional, *Kuha* seemed to allow for municipal liability – without the rigorous, deliberate indifference standard of fault – if the city simply had failed to implement a policy that would have prevented an unconstitutional act by an employee otherwise left to exercise his own discretion. Aside from the practical difficulties of requiring a city to produce a policy that dictates when advance warnings are required in the myriad circumstances that officers confront in the field, we believe the approach in *Kuha* conflicts with the rule that a claim for municipal liability premised on actions taken pursuant to an official municipal policy must demonstrate that the policy itself is unconstitutional. *Brown*, 520 U.S. at 404-05; *Pietrafeso*, 452 F.3d at 982; *Golberg*, 417 F.3d at 812; *Audio Odyssey*, 245 F.3d at 742; *Patzner*, 779 F.2d at 1367; *Dick*, 738 F.2d at 943.

-14-

We thus conclude that Szabla's reliance on *Kuha* is not persuasive, and his claim against Brooklyn Park fails as a matter of law for the reasons set forth above. Because aspects of the analysis in *Kuha* are inconsistent with our opinion today, and are likely to sow confusion if left undisturbed, we abandon Part II.C of our opinion in *Kuha* as circuit precedent.

\*     \*     \*

For the foregoing reasons, the judgment of the district court is affirmed.

JOHN R. GIBSON, Circuit Judge, with whom WOLLMAN, BYE, and MELLOY, Circuit Judges, join, dissenting.

Is it constitutional to authorize police to search houses, without requiring a warrant?[5] Is it constitutional to authorize police to dispose of seized property, without requiring notice to persons with claims to the property?[6] Is it constitutional to authorize use of a dog to bite and hold a suspect, without giving a warning first? The Constitution requires that each question be answered with a resounding "no."

If a city's policy affirmatively authorizes a procedure without requiring a safeguard that is constitutionally required, the city authorizes constitutional violations that result when its officers perform the procedure without the safeguard and in the process violate someone's constitutional rights.

This case, like <u>Kuha v. City of Minnetonka</u>, 365 F.3d 590 (8th Cir. 2004), was decided against the plaintiff on summary judgment, and we must consider the

---

[5]<u>See</u> <u>O'Brien v. City of Grand Rapids</u>, 23 F.3d 990, 1004 (6th Cir. 1994).

[6]<u>See</u> <u>Matthias v. Bingley</u>, 906 F.2d 1047, 1052, <u>amended</u>, 915 F.2d 946 (5th Cir. 1990).

evidence in the light most favorable to Szabla and give him the benefit of all reasonable inferences in the record. The City of Brooklyn Park adopted a policy allowing the use of dogs for apprehension.[7] The record supports the conclusion that apprehension was the same thing as tracking,"bite and hold," or "bitework."[8] The policy did not have any warning requirement. There is evidence from which a jury could conclude that Officer Baker used the dog in accordance with City policy, commanding the dog to "track", i.e., bite and hold, without issuing any warning. A jury could find that the result of this use was a violation of Szabla's Fourth Amendment right to be free from the use of excessive force in seizing his person.

The opinion of the court today turns on its conclusion that the policy at issue here, which authorizes use of dogs to apprehend, i.e., bite and hold, suspects but does not mention the need to warn first, is constitutional. Whether to warn, we are told, concerns merely "the manner" in which the dogs are used. Slip op. at 8 (emphasis in original). The court considers the policy deficient only in failure to give "detailed

---

[7]Brooklyn Park Directive No. 331 gives five areas in which "dogs may be properly used." The areas include: "b. To use in arresting known dangerous criminals who will, or might offer physical resistance to the arresting officer or who might attempt to flee or escape custody" and "c. To use in search and apprehension work for intruders, prowlers, escapees, burglars, window peepers, persons known or believed to have committed a crime of violence, persons attempting to flee or escape from police, and to use in trail work to locate missing persons." Officer Baker said item c was the one that covered the situation in issue. The policy does not state that a warning is necessary or, indeed, mention warnings at all.

[8]Baker, the officer who handled the dog, gave testimony that equates apprehensions and biting:
Q:"What does 'bitework' mean?
A: Apprehensions."
Baker talked about the difference between "search," which does not include apprehension, and "track," which does include apprehension. "Track" was the command he used.

guidance that might have averted a constitutional violation by an employee," a deficiency for which Brooklyn Park is not liable. Id.

The need for a warning is not a detail. Under our precedent, it is a generally required safeguard, which may be dispensed with only if there are exigent circumstances. In <u>Kuha v. City of Minnetonka</u>, 365 F.3d 590 (8th Cir. 2004) (the part of it that is not overruled by the court's decision today), we held that "a jury could properly find it objectively unreasonable to use a police dog trained in the bite and hold method without first giving the suspect a warning and opportunity for peaceful surrender." <u>Id.</u> at 598. We held that "there may be exceptional cases where a warning is not feasible." <u>Id.</u> at 599. I understand <u>Kuha</u> to hold generally that it is unreasonable, hence unconstitutional, to command a dog to bite and hold without warning the person about to be bitten. The Fourth Circuit has so held. See <u>Vathekan v. Prince George's County</u>, 154 F.3d 173, 179 (4th Cir. 1998) ("[F]ailure to give a warning before releasing a police dog is objectively unreasonable in an excessive force context."). In <u>Kuha</u> we phrased the issue in part as a question for the jury because there was a dispute about whether there were exceptional circumstances making the warning unfeasible, but the constitutional question of whether force was excessive under the Fourth Amendment on undisputed facts is a question of law. <u>Bell v. Irwin</u>, 321 F.3d 637, 640 (7th Cir. 2003); <u>see Vathekan</u>, 154 F.3d at 179 ("[I]t was clearly established in 1995 that failing to give a verbal warning before deploying a police dog to seize someone is objectively unreasonable and a violation of the Fourth Amendment."). Thus, generally, an officer commanding a dog to bite and hold must warn first, unless there are additional case-specific facts that make it unfeasible or undesirable in the particular case.[9] The need for a warning is the general rule, the permissibility of

---

[9]If this case proceeded to trial, a jury might find that this was one of those exceptional cases in which, for some reason, a warning was not feasible, or that even if Baker had given a warning, the same harm would have occurred. This depends on the resolution of fact issues that are entrusted to the jury: Would Szabla have heard a shouted warning? Would he have been able to surrender before the dog got to him?

dispensing with the warning is the exception. The possible exceptions may be "details," but the general rule is not.

This case involves a legislative-type, prospective city policy, which is the prototypic case for municipal liability. Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 690-91 (1978), held that a municipality could be liable under § 1983 for its own constitutional violations, but not violations by others, and in particular, not under the theory of respondeat superior. Id. Section 1983 imposes "liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." Id. at 692. Monell also extended municipal liability to customs or practices which may have originated within the lower levels of the city government but which had acquired the force of law. See id. at 691.

Once Monell opened up the possibility of § 1983 liability for city "policy," the question quickly arose whether such liability would be limited to prospective, legislative-type policies or whether it would extend to ad hoc, on the spot decisions by those in high positions within the city. In Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986), the Supreme Court held that the city could be liable for a "policy" that consisted of a single decision by municipal policymakers. In that context, the Court defined "policy" as a "deliberate choice to follow a course of action . . . from among various alternatives." Id. at 483.

As municipal liability continued to expand with the elastic meaning of "policy" to cover situations in which the injurious act was linked to policymakers only by their failure to prevent it, the Court crafted the "deliberate indifference" standard to

We cannot say. I contend only that the facts that Baker commanded the dog to track (i.e., bite and hold) without first issuing a warning, that this was authorized by city policy, and that the dog injured Szabla are enough to go to a jury on causation.

-18-

distinguish between cases in which the city's inaction could fairly be said to have caused the injurious action and those in which it could not. See City of Canton v. Harris, 489 U.S. 378, 388 (1989). The Court held that a municipality sometimes can be liable for the actions of an employee that was not directed or authorized by the city, but that in such cases the deliberate indifference standard of fault will be superimposed on section 1983, which itself requires no particular state of mind other than that which is necessary to state a violation of the underlying constitutional right. Id. at 405.[10] "Deliberate indifference" is a "stringent standard of fault . . . requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Comm'rs of Brown Co. v. Bryan, 520 U.S. 397, 410 (1997). City of Canton was not a case where the policymaker was alleged to have directed or authorized the offending act (failure to provide medical care for pre-trial detainees)–the City was only alleged to have failed to train its employees so as to prevent them from committing the offending act.

In the last of the major Supreme Court cases in this area, Board of Commissioners of Brown County v. Bryan, 520 U.S. 397 (1997), the Court applied the deliberate indifference standard even though the plaintiff's claim characterized the county's act as an affirmative act–wrongful hiring of a police officer who later used

---

[10]Szabla's underlying constitutional claim, is of course, for use of excessive force in violation of the Fourth Amendment. A Fourth Amendment claim for use of excessive force in making an arrest requires a seizure, consisting of (1) "an intentional acquisition of physical control," (2) through means intentionally applied. Brower v. Inyo County, 489 U.S. 593, 596-97 (1989); McCoy v. City of Monticello, 411 F.3d 920, 922 (8th Cir. 2005). The intentional seizure requirement is satisfied as against the City of Brooklyn Heights, since it authorized the use of dogs to apprehend persons by biting. The fact that Szabla was not the person who fled from the car is irrelevant, since "[a] seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be willful." Brower, 489 U.S. at 596 (citations omitted). Additionally, an excessive force claim requires unreasonable use of force, which is judged by an objective, not subjective standard. Graham v. Connor, 490 U.S. 386, 396-97 (1989).

excessive force–rather than as an omission like failure to train.  The important thing for our purposes is that the "policy" alleged in <u>Bryan</u> did not authorize the injurious action–the policymaker sheriff did not authorize the use of excessive force; at most, the policy allowed the injurious action to happen.  Justice O'Connor distinguished between cases where the deliberate indifference element was not necessary and those where it was, which she described as "[c]laims not involving an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights."  520 U.S. at 406.  Szabla claims that the municipality authorized the act which deprived him of his rights, so his case falls on the side of the line where the deliberate indifference element should not be required.

Our court today argues that the deliberate indifference standard must be applied if the city's policy was "lawful on its face and does not compel unconstitutional action by an employee of the municipality."  Slip op. at 5.  This standard contains an implicit distinction between policies that <u>compel</u> unconstitutional action by an employee (which need not be supplemented by the additional deliberate indifference element) and those that merely <u>authorize</u> such actions (which must be supplemented).  I see no reason for this distinction.  It is not mandated by the Supreme Court; Justice O'Connor's opinion in <u>Brown</u> puts these two categories on a par when she refers to municipal actions that "directed or authorized the deprivation of federal rights."  502 U.S. at 406.  Here, where the municipality authorized an action without a constitutionally required safeguard, I do not think that its policy should be considered "facially lawful"–perhaps a better term would be "superficially lawful."

The Supreme Court has not had occasion to explain what "facial" lawfulness means in the <u>Monell</u> context.  The term is ordinarily used as a standing test, where it determines whether a person can mount a challenge to a statute even though the statute is not unconstitutional as applied to him.  <u>See</u> <u>generally</u> <u>Sabri v. United States</u>, 541 U.S. 600, 609-10 (2004).  In the strictest formulation, for a measure to be unconstitutional on its face, there need only be a possibility that it could be applied

constitutionally in some case.  See United States v. Salerno, 481 U.S. 739, 745 (1987) (measure unconstitutional on its face only if no set of circumstances exists under which the [measure] would be valid").  This test does not ask whether the measure is likely to lead to unconstitutional results in the vast majority of cases.  If a policy causes a constitutional violation 99 times in a hundred, it will be facially constitutional if it can be applied once without such a violation.  In a case such as this one, where there is a generally applicable safeguard which must be required in the absence of exceptional circumstances, the policy will usually cause a violation.  Would it be fair to say that the municipality did not cause the harm in the 99 cases where the safeguard was required?  Would it be consistent with Monell?  I think not.

There is disagreement within the Supreme Court over whether the Salerno test is a correct formulation.  See Janklow v. Planned Parenthood, 517 U.S. 1174 (1996).  If our court were to propose a less categorical definition of "facially constitutional," one for instance that would hinge on whether the measure would lead to constitutional violations in a "large fraction" of cases, see Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 895 (1992), the test might more closely coincide with a proper reading of the Monell cases.  It would, of course, be a more liberal standard than the one I stated in the second paragraph of this dissent.

Despite the lip service given to the facially constitutional test, courts have in fact found that liability could be imposed for a municipal policy that affirmatively authorized a foreseeable constitutional injury, even though the policy was not unconstitutional on its face, at least according to the Salerno test.  A good example is the municipal policy that authorized using deadly force against fleeing felony suspects in Garner v. Memphis Police Dep't, 8 F.3d 358 (6th Cir. 1993).  The Supreme Court had decided earlier in the same litigation that it was unconstitutional to use deadly force against an unarmed, non-dangerous felony suspect.  Tennessee v. Garner, 471 U.S. 1, 11 (1985).  The Supreme Court remanded for consideration of the City's liability under Monell v. Department of Social Services of City of New York, 436

U.S. 658 (1978). 471 U.S. at 22. On remand, the Sixth Circuit held that "there is a sufficient link between defendants' deadly force policy and [the officer's] actions to establish that the policy was the 'moving force of the constitutional violation.'" Garner, 8 F.3d at 365 (quoting Monell, 436 U.S. at 694). Earlier in the case the Supreme Court had held that the comparable state statute authorizing deadly force against fleeing felony suspects was not unconstitutional on its face, since if there were reason to think the suspect dangerous, such force could be used (if, where feasible, warning had been given), 471 U.S. at 11-12, but it was unconstitutional when applied to the plaintiff's son. "The Tennessee statute is unconstitutional insofar as it authorizes the use of deadly force against [unarmed, nondangerous] fleeing suspects." 471 U.S. at 11. Thus the Sixth Circuit held that the City could be liable for the deadly force policy, even though it was not facially unconstitutional, because it was a blanket authorization that extended to cases where the force authorized was excessive. The Sixth Circuit rejected the idea that the City policy had to be tested for deliberate indifference, since the City had in effect "trained their officers to exceed" the constitutionally allowed limits on use of deadly force. 8 F.3d at 366. The City of Memphis trained its officers to exceed the constitutional limits in exactly the way the City of Brooklyn Park did here: by authorizing force that might be constitutional in some cases, but was excessive in many others. The Ninth Circuit made a similar holding in a dog-bite case, Chew v. Gates, 27 F.3d 1432, 1444-45 (9th Cir. 1994), when it held that a city policy that "authorized seizure of all concealed suspects–resistant or nonresistant, armed or unarmed, violent or nonviolent–by dogs trained to bite hard and hold" could be found to be the moving force behind injuries to a plaintiff who was bitten.

Authorizing a course of action without including constitutionally required safeguards or exceptions to the authorization has been a sufficient basis for municipal liability in other cases. In Matthias v. Bingley, 906 F.2d 1047, 1052 (5th Cir. 1990), amended, 915 F.2d 946 (5th Cir. 1990), City Ordinance 34-31 outlined the steps a police officer had to take before disposing of personal property that had been seized.

The Ordinance failed to require notification of persons who had claims in the property other than ownership interests and did not require publication of notice. "[E]ven if every City employee strictly complies with the City's system for processing seized property . . . the system itself still blatantly violates the Due Process Clause." Id. at 1058. The city was liable.

Similarly, in O'Brien v. City of Grand Rapids, 23 F.3d 990, 1004 (6th Cir. 1994), the city had adopted a "critical incident" plan that included "probes" of houses and was silent as to the need to obtain a warrant. Id. at 994, 1004. (An expert consultant had also trained the police force that warrants were not required in critical incidents, "making no distinction between the varying circumstances that could be presented," id. at 1004.) In O'Brien's case, there were no exigent circumstances, so the probe violated the Fourth Amendment. The city was liable for the Fourth Amendment violations. Id. at 1005.

In Gibson v. County of Washoe, 290 F.3d 1175, 1187-93 (9th Cir. 2002), a county jail had a medical care policy requiring provision of medical care generally, but which excluded immediate care for "combative" or "uncooperative" prisoners. This policy, though valid with regard to most prisoners, commanded a delay in care for a combative manic prisoner, which violated the Eighth Amendment; the county was therefore not entitled to summary judgment on the § 1983 claim filed by the representative of such a prisoner who was injured by the lack of treatment. Accord Kostrzewa v. City of Troy, 247 F.3d 633, 645 (6th Cir. 2001) (policy requiring police to handcuff all persons arrested could support municipal liability where police put cuffs that were too small on non-violent detainee and thereby injured him); Tardiff v. Knox County, 397 F. Supp. 2d 115, 131 (D. Me. 2005) (County's policy of strip searching all felony detainees was unconstitutional as applied to detainees charged with non-violent, non-weapon, and non-drug offenses; county liable for resulting searches under § 1983), motion for reconsideration denied, 425 F. Supp. 2d 159 (D. Me. 2006).

Even if one were to conclude that "deliberate indifference" was prerequisite to Monell liability in a case of affirmative authorization of the unconstitutional act, deliberate indifference exists where a city authorizes a course of action without mandating safeguards that are required in every case or required unless there are mitigating or exceptional circumstances. In City of Canton, Justice White, writing for the Court, held that a failure to train theory could conceivably result in municipal liability, but that the municipality's degree of fault would have to rise to the level of deliberate indifference to the rights of the persons who will be affected. 489 U.S. at 388. The Court made clear however, that, deliberate indifference did not require evidence of an actual subjective choice:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be liable if it actually causes injury.

Id. at 390. Farmer v. Brennan, 511 U.S. 825 (1994), explained that "deliberate indifference" in the § 1983 context does not require a subjective consciousness of the risk, even though the same term requires subjective consciousness in the Eighth Amendment context. Id. at 841 ("It would be hard to describe the Canton understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective. Canton's objective standard, however, is not an appropriate test for determining the liability of prison officials under the Eighth Amendment . . . .").

In City of Canton Justice White addressed something like the question before us when he gave the following example:

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, see Tennessee v. Garner, 471 U.S. 1 (1985), can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

489 U.S. at 390 n.10. This example demonstrates that even where a city did not explicitly authorize a certain action, it is responsible for assuring that constitutional safeguards are observed if it knows "to a moral certainty" that the situation will arise that requires its employees to observe those safeguards. See id. at 396 (O'Connor, J., concurring) (City would be liable for harm caused by failure to address "a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face."); Russell v. Hennepin County, 420 F.3d 841, 847 (8th Cir. 2005) ("A policy is deliberately indifferent to a person's constitutional rights when its inadequacy is both obvious and likely to result in the alleged deprivation of constitutional rights."); Natale v. Camden County Corr. Facility, 318 F.3d 575, 584-85 (3d Cir. 2003) (county jail's failure to establish policy to address immediate medication needs of prisoners created obvious risk and likelihood of Eighth Amendment violation presenting issue of fact for Monell liability).

By Justice White's reasoning in City of Canton, the City of Memphis in Garner, supra at 7, would have been responsible to train its officers not to shoot unarmed, non-dangerous fleeing felons, even if it had not had a policy saying police could shoot them. But since Memphis in fact had a written policy saying police could shoot at all fleeing felons, its responsibility is even more direct than in Justice White's hypothetical, and even more securely within the Monell doctrine. Memphis did not merely know "to a moral certainty" that the officers would shoot fleeing felons (as in Justice White's hypothetical), it told them they could do so. The City's policy was an affirmative link, a moving force, and a direct cause of its officers shooting Garner. Likewise, in this case there is no question that the City of Brooklyn Park knew that

its officers would use dogs to apprehend (i.e., bite and hold) people, since the City adopted a written policy telling them they could do so. The need to warn was a "clear constitutional duty" inherent in a situation created by City policy "and it is equally clear that failure to inform city personnel of that duty will create an extremely high risk that constitutional violations will ensue." City of Canton, 489 U.S. at 396 (O'Connor, J., concurring).

We have found deliberate indifference where a municipality ignored an obvious risk it created. In Hayes v. Faulkner County, 388 F.3d 669, 674 (8th Cir. 2004), this court held that a policy that "ignores" the municipal actor's constitutional obligations inherent in the situation addressed by the policy could be deemed "deliberately indifferent." There, when the county arrested suspects, its policy was to submit their names to the court and wait for the court to schedule a hearing. The county followed its policy, resulting in the plaintiff in the case languishing in the county jail for 38 days before receiving a hearing. We held that the county's policy was deliberately indifferent to the detainee's due process rights, not because the county affirmatively ordered the plaintiff to be held 38 days without a hearing (it did not), but because the policy attempted to delegate responsibility to the court and had no safeguard of its own, though such a safeguard was required. Accord Berg v. County of Allegheny, 219 F.3d 261, 276-77 (3d Cir. 2000) (County created danger and did nothing to allay it; "Having employed a design where the slip of a finger could result in wrongful arrest and imprisonment, there remains an issue of fact whether the County was deliberately indifferent to an obvious risk.").

The court today argues that this case is one where the policy did not "affirmatively sanction" the violation, but the municipality instead properly decided to rely on the judgment of its employees. Slip op. at 6-7, citing Dick v. Watonwan

-26-

County, 738 F.2d 939 (8th Cir. 1984).[11] In Dick, the county had a policy that allowed its social work officers to decide whether there was enough evidence to justify taking an involuntary commitment case to the County Attorney. The officers decided there was such evidence and referred the case based solely on the false statements of the plaintiffs' fifteen year-old daughter; the County Attorney had the plaintiffs committed in a detoxification center for three days. Judge Richard Arnold said that the policy left it up to individual officers to use their discretion and that this was not unconstitutional and therefore could not lead to Monell liability. Id. at 942-43. But Dick is distinguishable from Szabla because in Dick there was no particular procedure (like the warning) that was constitutionally required, but was omitted. Moreover, in Dick we relied on the fact that the policy did not authorize the specific course of action the officers took, but merely left the decision up to officers' discretion. Id. at 942-43. Judge Arnold said that the county may have been able to prevent the violation by more narrowly channeling officers' discretion, but failure to channel their discretion did not lead to liability. But what if the county had had guidelines that said if a child reports that his or her parents are drunk, then the County Attorney should put the parents in a detoxification center, with no mention of the need to investigate further or take into account contrary evidence? In the hypothetical, the county could be said to have directly caused the reporting and detention.

One last point. The Supreme Court held in Owen v. City of Independence, 445 U.S. 622, 635-58 (1980), that municipalities are not entitled to qualified immunity under § 1983. There, the City of Independence failed to provide a name-clearing hearing for a government employee stigmatized in the course of being fired by the City, but the City contended that it had acted in good faith because the right to such

---

[11]We should use caution in relying on Dick because Dick stated that municipal liability depended on whether the policy in question was constitutional. 738 F.2d at 943. After Dick was decided, in City of Canton the Supreme Court said: "[W]e reject petitioner's contention that only unconstitutional policies are actionable" under § 1983. 489 U.S. at 387. On this point, Dick has been overruled.

a hearing did not become established until two months after the City's actions. Id. at 634. Justice Brennan considered at length the legislative history of § 1983 and the relevant policy considerations and concluded that good faith would not shield the City from § 1983 liability. Similarly, in Pembaur v. City of Cincinnati, 475 U.S. 469, 474, 485 (1986), the City of Cincinnati was held liable for allowing police to enter Pembaur's business without a warrant to execute an arrest warrant on a third person, even though it was not established at the time of the entry that this violated Pembaur's Fourth Amendment rights.

In the face of these two Supreme Court holdings, our court today holds that in cases of municipal liability that depend on a showing of deliberate indifference (i.e., most of them), a municipality cannot be liable unless the law was clearly established at the time of its action. Slip op. at 10-12. Thus, via the words "deliberate indifference," our court imports the qualified immunity standard into municipal liability. The court relies on the Second Circuit's statement in Townes v. City of New York, 176 F.3d 138, 143-44 (2d Cir. 1999), and Young v. County of Fulton, 160 F.3d 899, 904 (2d Cir. 1998). In both those cases, the discussion is a single sentence and relies on Walker v. City of New York, 974 F.2d 293 (2d Cir. 1992), which does not support affording qualified immunity to municipalities, and what is more, actually holds that the City of New York could be liable for failure to train specifically because the applicable law was not "obvious or easy to apply" at the time of the events in question. Id. at 300.

Our court also relies on Justice O'Connor's concurring and dissenting opinion in City of Canton, in which she contended that the constitutional law governing rights of pre-trial detainees to medical treatment was not sufficiently clear to support municipal liability. Contrary to Justice O'Connor's view, the majority opinion in City of Canton does not require that the offending act must be contrary to clearly established law at the time of the act in order to give rise to municipal liability. The holding of the majority in City of Canton was to remand the case–as Justice Brennan

-28-

pointed out in his concurrence, that meant remanding for new trial. 489 U.S. at 393. Thus, if the majority in City of Canton had agreed with Justice O'Connor that the law had to be clearly established at the time of the offending act to meet the standard of causation and fault outlined in the case, the majority would have ordered entry of judgment for the City. It did not do so. "In [City of Canton v. ]Harris, 'deliberate indifference' refers to indifference to injuries likely to result from a failure to act, not indifference to whether such injuries constitute deprivation of a constitutional right." Garner, 8 F.3d at 366.

All our discussions about the refinements of Supreme Court cases considering municipal liability in § 1983 cases can obscure the point of the line of cases as a whole, which is to ask who should be liable for the constitutional tort–the city or only its employee. The rights and wrongs of this case can be clarified by asking whether the city could blame Baker for commanding the dog to bite and hold without giving a warning first. Baker would respond, in all justice, that he just did what the city told him to do. Here, the city had an official, legislative-type policy that authorized Baker to do what he did and Szabla was harmed in just the way one would expect from looking at the policy. Who did something wrong, who caused the tort? The jury could find that the city did. That should be enough to send this case to trial.

I respectfully dissent.

_____