# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-1412
_____

Rodney Brossart, et al.

*Plaintiffs - Appellants*

v.

Kelly Janke, et al.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of North Dakota - Fargo

_____

Submitted: February 7, 2017
Filed: June 16, 2017

_____

Before LOKEN, COLLOTON, and KELLY, Circuit Judges.

_____

LOKEN, Circuit Judge.

During confrontations that extended over two days at the Brossart family farmstead in Nelson County, North Dakota, Deputy Sheriff Eric Braathen tased both Rodney Brossart and his son, Thomas Brossart. The Brossarts, including Rodney's wife, Susan, brought this action against Braathen, his supervisor, Sheriff Kelly Janke, and Nelson County, asserting federal claims under 42 U.S.C. § 1983 that Braathen used excessive force in violation of the Fourth Amendment, Janke is liable for the

violations in his supervisory capacity, and Nelson County is liable for adopting an unconstitutional Taser Policy and for failing to train Braathen. The Brossarts also asserted pendent state law claims. The district court[1] dismissed the state law claims as time-barred in a December 2014 Order. After the Brossarts filed an Amended Complaint, the district court granted defendants summary judgment and dismissed the Amended Complaint with prejudice in a January 2016 Order. The Brossarts appeal both orders. Reviewing the grant of summary judgment *de novo* and viewing the facts in the light most favorable to the Brossarts, the non-moving parties, we affirm.

## I. Background.

**A. Tasing of Rodney Brossart.** On June 22, 2011, the Brossarts discovered six loose cattle on their property. They did not own these cattle but secured them in an old missile silo that evening without giving the notice to the county sheriff or to the chief brand inspector required by a North Dakota estray statute. See N.D.C.C. § 36-13-01 (2012). The following morning, Rodney's neighbor, Chris Anderson, tracked the cattle to the Brossarts property and spoke to Rodney, who declined to release the cattle and said Anderson should contact his insurance company regarding damage the cattle caused. Anderson left and phoned a complaint to the Nelson County Sheriff's Department, which was referred to Deputy Braathen. Braathen contacted the State's attorney, who advised that a criminal violation of the estray laws might be in issue. Braathen next contacted Fred Frederickson, a licensed peace officer and brand inspector for the North Dakota Stockman's Association. Braathen and Frederickson met with Anderson, who said he found his cattle at the Brossart missile silo, and Rodney said Anderson would have to pay to get them back. Anderson provided Frederickson brand papers for the cattle. Braathen and Frederickson set out for the Brossart farm in a patrol car to investigate.

---

[1]The Honorable Ralph R. Erickson, United States District Judge for the District of District of North Dakota.

Near the farm, the officers encountered Rodney and his son Jacob blocking the rural road while using a pump to drain water from a ditch. The summary judgment record includes a transcript of the recorded conversation. Braathen first introduced Frederickson to Rodney, who refused to shake hands and questioned Frederickson's authority. Frederickson asked for permission to inspect the cattle, explaining he had brand papers and the officers had received a complaint. Rodney said, "Well, when I get done here." Braathen said, "We're going to do it now, Rodney." Rodney replied, "if you can step foot on that property, mister, you're not going to be walking away." Frederickson interjected, "Hey, you don't want to make threats, okay? Don't make threats like that."[2]

Braathen then said they were going to see the cattle. Rodney replied, "I'll be done here after a bit," turned away from Braathen, and walked towards his equipment to remove his pump from the roadway, ignoring Braathen's warning, "We're not giving you a choice here." When Rodney insisted he would finish his work, Braathen said, "You're going to go to jail if we don't cooperate now." Rodney replied, "Where's the writ? Give me the writ." Braathen said, "All right, you're under arrest."[3] The confrontation escalated. The Amended Complaint described the following sequence:

---

[2]A state court jury subsequently convicted Rodney of terrorizing in violation of N.D.C.C. § 12.1-17-04, a class C felony, after a trial at which Frederickson testified he took this comment as a serious threat. The Supreme Court of North Dakota held that a jury could find the comment to be a true threat, rather than protected speech, but remanded for a new trial because the jury was not properly instructed on that issue. State v. Brossart, 858 N.W.2d 275, 280-85 (N.D. 2015).

[3]In affirming Rodney's conviction for preventing arrest, a class A misdemeanor, and failing to comply with estray law, a class B misdemeanor, the Supreme Court of North Dakota upheld the trial court's ruling that Braathen had probable cause to arrest Rodney after he threatened the officers, for terrorizing and for violation of an estray law, N.D.C.C. § 36-13-08. Brossart, 858 N.W.2d at 290.

At that point, Deputy Sheriff Braathen pulled out his pair of handcuffs and grabbed Rodney Brossart's right hand to secure him in handcuffs. Rodney resisted by backing away, according to Deputy Sheriff Braathen's testimony. Then Braathen pulled out his Taser gun, activated it, and pointed it at Brossart, while instructing him to get to the ground. He said, 'I commanded him at least three times.'

. . . Rodney Brossart yelled to his son, Jacob, to 'get it' and pointed at the pickup.

Jacob Brossart was detained by Inspector Frederickson and place[d] in his car.

Then Deputy Sheriff Braathen decided to activate his Taser.

The patrol car recording supports these allegations. After Braathen informs Rodney that he is under arrest, Rodney inquires "for what," and is heard saying "[g]et, get." Braathen testified that Rodney said those words to his son, Jacob, who headed for the pickup truck but was intercepted by Frederickson before he reached it. The truck contained two firearms and ammunition. Braathen is heard saying: "Rodney! Down on the ground! Down on the ground! Down on the ground! Down on the ground."

Braathen then deployed his taser for the first time, firing two probes in dart-mode into Rodney's pectoral region. Rodney stumbled backward to the edge of the road. On the patrol car recording, Braathen is heard saying "[d]on't move! Stay on the ground . . . . Down on the ground, Rodney!" The Amended Complaint alleged, "Brossart goes down on one knee and then gets back up again." Braathen re-activated the taser when Rodney continued to ignore commands to stay down. Rodney fell down and rolled into the ditch. On the recording, Braathen tells Frederickson to "cuff him" and calls for back-up. Rodney says, "I want some proof of that guy's authority." In response to Braathen's repeated commands to "stay down," Rodney first accuses Deputy Braathen of stepping on his phone and then repeatedly says, "Where's my glasses?" Braathen repeatedly warns, "You move again Rodney, and you're going to

-4-

get tased . . . Stay down! . . . Rodney, if you move at all I'll tase you again!" The patrol car recording reveals that Rodney would not stay on his knees or otherwise cooperate:

OFFICER FREDERICKSON:  Put your hands behind your back.

RODNEY BROSSART:  (inaudible) my phone!

DEPUTY BRAATHEN:  Rodney! Down! Get down on your knees!

RODNEY BROSSART:  There it is!

DEPUTY BRAATHEN:  Down on your knees!

RODNEY BROSSART:  Where's my glasses?

DEPUTY BRAATHEN:  Rodney!

RODNEY BROSSART:  Where's my glasses?

DEPUTY BRAATHEN:  Rodney, I'm going to tase you again!

RODNEY BROSSART:  Where's my glasses?

(Taser sounds and moaning).

The Amended Complaint alleges that Braathen "noticed that Rodney Brossart was attempting to stand up in a 'very hostile, aggressive manner'" and tased Rodney a third time in the ditch for "not responding to his command to get back down." Braathen also touched the taser to the back of Rodney's neck. "Moments later, Rodney Brossart attempted to get up and Deputy Sheriff Braathen command[ed] him to get back down in the mud, while waiting for Inspector Frederickson to come down into the ditch to assist in handcuffing Brossart." Braathen tased him a fourth time for trying to resist, deploying more darts in his pectoral region. When Rodney resisted

-5-

the attempted handcuffing, Braathen tased him a fifth time, achieving "complete neuromuscular incapacitation."

Braathen and Frederickson handcuffed Rodney, walked him to the patrol car, and placed him in the back seat. Transported by ambulance to a local hospital, Rodney was examined for two hours and five darts were removed before he was transported to the correctional center. He suffered no permanent scarring or disfigurement.

**B. June 23 Armed Standoff.** That evening, Braathen and Sheriff Janke returned to the Brossart farmstead with a search warrant to retrieve the six cattle. When they walked into the yard, three of Rodney's sons, Alex, Thomas, and Jacob, exited the house carrying rifles and told the officers they were trespassing on private property. The officers drew their guns and backed away, then retreated "about a mile north" where they called a crisis negotiation team. The Grand Forks SWAT team with support from adjoining counties arrived to establish a perimeter around the Brossart home, then left for the evening. Two agents did a drive-by and confirmed the cattle remained in the missile silo.

**C. June 24 Tasing of Thomas Brossart.** The next morning, law enforcement including the SWAT team proceeded to the missile silo to execute the search warrant. As they were removing the cattle, Thomas Brossart came to the silo on his three-wheeler, while brothers Jacob and Alex rode over on a tractor. Thomas told law enforcement that they were trespassing on private property and to leave. The SWAT team arrested the brothers on terrorizing charges, based on the prior evening's events. Deputies Braathen and Olson, waiting two miles south, were called in to transport the brothers to the correctional center. When Braathen arrived, the three brothers were handcuffed and lying on the ground, held at gun point by a SWAT team member.

Thomas refused to walk to the patrol car, so the deputies dragged him and placed him in the back seat. So all three brothers could be placed in the back seat, Braathen told Thomas to move over. Thomas moved a couple inches. Thomas alleges that Braathen then tased him on his left leg in drive stun mode. The parties dispute whether Braathen warned Thomas that he would be tased if he did not move. Braathen claims Thomas would only say: "This is my property and I don't agree to the sale" (an obvious reference to the cattle). Braathen considered Thomas's refusal to be further resistance and testified that he used the taser because physically moving Thomas risked being kicked by Thomas or causing him greater injury. The tasing resulted in a slight burn mark on Thomas that lasted less than a day and did not require medical treatment.

After the tasing, Deputy Olson pulled Thomas to the middle seat, and Jacob and Alex were placed in the back seat with Thomas. Throughout the drive to the correctional center, the brothers chanted: "This is my property and I don't agree to the sale." Thomas explained they found this phrase on the internet, and it conveyed their belief they were illegally arrested.

**D. The Nelson County Taser Policy.** At the time of these events, the Nelson County Sheriff's Department had written policies in place for the use of force, entitled "Use of Control Continuum," and for the use of tasers, entitled "Less Lethal Weapons - Taser X26" (hereafter referred to as the "Taser Policy"). Janke adopted the Taser Policy in 2009. The Use of Control Continuum instructed officers to use control methods "only to the extent reasonable and necessary" and to consider the "totality of the circumstances." The Taser Policy required officer training: "Only officers receiving training and certification from an authorized TASER X26 instructor will be allowed to carry and deploy the weapon system when deemed appropriate. These officers will be required to attend and successfully complete an initial certification course of instruction and will also be required to successfully re-certify annually." Braathen was trained in taser use in January 2009 and again in January 2011, five

months prior to the incidents at issue. Neither Nelson County nor Sheriff Janke had received any prior complaints regarding excessive force or taser use by any member of the Nelson County Sheriff's Department.

The Taser Policy recommended taser use when it "reduces the risk of injury or death to those involved." The Policy instructed that "[o]fficers are authorized to deploy the TASER X26 to gain control when faced with actual or threatened physical resistance. Officers are discouraged from deploying the TASER X26 on subjects where no physical violence or threat of physical violence exists (i.e. non-violent fleeing subjects)." The "Deployment Procedures" section provided that "[o]fficers should, if feasible and safe, provide a verbal warning to the suspect of the pending deployment of the TASER X26 in order to provide a final opportunity for compliance." The "Restrictions" section instructed that a taser "should not be deployed . . . [i]n cases of passive resistance," unless lesser force was unsuccessfully attempted, is not possible given the circumstances, or risks "a possibility of injury of suspect or officer," and "shall never be used punitively or for coercion or threat in the absence of actual or threatened physical resistance . . . [or] against a person already in custody unless physical resistance has to be overcome."

**E. Procedural History.** After the district court dismissed state law claims of the tort of outrage, battery, negligent supervision, and mental anguish as time-barred, plaintiffs filed an Amended Complaint alleging that Susan experienced severe emotional distress as a result of the federal constitutional violations committed against Thomas and Rodney. The district court granted defendants' motions for summary judgment and dismissed the Amended Complaint with prejudice. On appeal, the Brossarts argue the district court erred in granting summary judgment on their Fourth Amendment excessive force claims, dismissing all claims of supervisory and municipal liability, and dismissing their state law claims as time-barred.

## II. Discussion.

**A. Rodney's Excessive Force Claim.** Plaintiffs argue the district court erred in granting Deputy Braathen and Sheriff Janke qualified immunity because Braathen's actions "aggressively approaching Rodney, escalating the conflict, and repeatedly tasering Rodney" violated his clearly established Fourth Amendment rights.[4] Qualified immunity shields officers from civil damage liability for discretionary acts when "[their] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." White v. Pauly, 137 S. Ct. 548, 551 (2017) (quotations omitted). To avoid pre-trial dismissal, a plaintiff must show both that (1) the facts demonstrate that the plaintiff suffered a violation of a constitutional or statutory right and (2) the right was clearly established at the time of the defendant's alleged misconduct. See, e.g., Ehlers v. City of Rapid City, 846 F.3d 1002, 1008 (8th Cir. 2017).

In this case, the district court concluded that Braathen was entitled to qualified immunity because plaintiffs made neither showing. First, the court concluded, there was no Fourth Amendment violation because "Rodney engaged in conduct during the course of his encounter with law enforcement officers that renders Braathen's conduct reasonable." Second, the court concluded, "Rodney's assertion that multiple tasings constitute a violation of a clearly established constitutional right is also unsupported in law." We agree with both conclusions.[5]

---

[4]Plaintiffs also argue that qualified immunity was not timely raised because defendants missed the district court's deadline for filing threshold motions. As plaintiffs first raised this argument on appeal, it is waived. See Joseph v. Allen, 712 F.3d 1222, 1226 (8th Cir. 2013).

[5]The district court also ruled that Rodney's claim was barred by the Supreme Court's decision in Heck v. Humphrey, 512 U.S. 477 (1994), because the state court jury in convicting Rodney of preventing arrest necessarily found that Braathen did not use excessive force. The parties briefed and argued this issue on appeal, but because

The Fourth Amendment's objective reasonableness standard governs a claim that an officer used excessive force "in the course of making an arrest, investigatory stop, or other 'seizure.'" Graham v. Connor, 490 U.S. 386, 388 (1989). We apply this standard to Fourth Amendment claims of excessive force brought by detainees in custody. See Davis v. White, 794 F.3d 1008, 1011-12 (8th Cir. 2015). The analysis "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake," as well as "careful attention to the facts and circumstances of each particular case." Graham, 490 U.S. at 396 (quotations omitted); see County of Los Angeles v. Mendez, — S. Ct. —, 2017 WL 2322832, at *6 (2017) . We consider the "'reasonableness' of a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. Whether the force used was constitutionally excessive is an issue of law. Davis, 794 F.3d at 1013.

In applying this standard, the district court reasoned:

> Rodney told Frederickson that the officers would not leave his property if they stepped foot on it. Throughout the course of his arrest, Rodney persisted in resisting Braathen's commands. In addition, Brossart made an apparent threat involving firearms when he commanded his son to "get it." From a reasonable officer's perspective, Rodney's behavior was volatile, dangerous and clearly posed a threat to Braathen and Frederickson's personal safety. Given the circumstances in which he found himself, Braathen's actions fall squarely within the guidelines of Nelson County's use of force continuum, which the court has found constitutional on its face. Braathen's actions were not unreasonable under the circumstances.

We agree with the district court's reasoning. The undisputed summary judgment record establishes, and the state court jury verdict and Supreme Court of North

we affirm the district court's alternative ground, we need not consider it.

-10-

Dakota's opinion strongly confirm, that Rodney made two threats of violence to the law enforcement officers, repeatedly did not comply with Braathen's orders to cooperate in a potentially criminal investigation, and then resisted being handcuffed when told he was under arrest. Braathen's use of a taser under the circumstances was a reasonable use of significant non-lethal force. See Ehlers, 846 F.3d at 1012.

Rodney argues that "even if the first Tasering were legitimate, the subsequent Taserings of a suspect on the ground are unconstitutional." He asserts that our decision affirming the denial of qualified immunity in Shekleton v. Eichenberger, 677 F.3d 361 (8th Cir. 2012), clearly established that Braathan's conduct was unconstitutional. We disagree. In Shekleton, the officer tased "an unarmed suspected misdemeanant, who did not resist arrest, did not threaten the officer, did not attempt to run from him, and did not behave aggressively towards him." Id. at 366. Here, the Amended Complaint alleged that Rodney continually ignored commands to stay down, attempted to stand up, and resisted arrest. On the patrol car recording, Braathen repeatedly tells Rodney that he must not move or he will be tased again and instructs Rodney to stay on his knees. "Law enforcement officers may use physical force to subdue an arrestee when he fails to comply with orders to lie still during handcuffing." Carpenter v. Gage, 686 F.3d 644, 649 (8th Cir. 2012), cert. denied, 135 S. Ct. 955 (2013) (rejecting a claim that tasing was the use of excessive force). Shekleton does not apply to the facts of this case.

We further agree with the district court's alternative conclusion that Braathen is entitled to qualified immunity because, even if his repeated use of the taser was unreasonable, it did not violate clearly established law. For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." Pauly, 137 S. Ct. at 551 (quotations omitted). Our prior cases have clearly established that "use of [a] taser on a nonfleeing, nonviolent suspected misdemeanant [is] unreasonable." Shekleton, 677 F.3d at 367, citing Brown v. City of Golden Valley, 574 F.3d 491, 499-500 (8th Cir. 2009).

-11-

Here, Rodney refused to cooperate with officers attempting to investigate a possible criminal violation, made threats of violence sufficient to support conviction of a terrorizing felony, then physically resisted a lawful arrest, ignoring repeated commands to lie down or be tased. Use of force requires a particularized Graham v. Connor Fourth Amendment analysis, and the Supreme Court has instructed that, in the qualified immunity context, "Graham do[es] not by [itself] create clearly established law outside 'an obvious case.'" Pauly, 137 S. Ct. at 552. Braathen's repeated use of the taser against a potentially violent, defiant arrestee was not an obvious case. For example, in De Boise v. Taser Int'l, Inc., 760 F.3d 892 (8th Cir. 2014), cert. denied, 135 S. Ct. 2348 (2015), we affirmed the grant of qualified immunity to officers whose multiple tasings resulted in the death of a violent, delusional schizophrenic person who threatened officers attempting to handcuff him and continued to struggle after eight tasings. We explained that "no reasonable officer, observing De Boise's behavior, would have understood the actions taken to be so disproportionate and unnecessary as to amount to a [constitutional] violation." Id. at 897-98.

**B. Thomas's Excessive Force Claim.** Plaintiffs argue that Braathen's tasing of Thomas while he was handcuffed and detained in the back seat of a squad car constituted clearly established use of excessive force. In rejecting this contention, the district court explained:

> The undisputed facts show that Thomas actively opposed law enforcement officers' efforts to secure his neighbor's cattle. He participated in an armed standoff with law enforcement and the Grand Forks SWAT Team. Two officers were necessary to get him in the police car after he was placed under arrest. While under arrest, he continued to verbally resist the officers' actions by stating, "This is my property and I don't agree to the sale." Once in the car Thomas intentionally failed to comply with a lawful command by refusing to move over. His response to the command was classically passive aggressive -- he moved mere inches. Given the tense, stand-off-like situation the arresting officers found themselves in coupled with

-12-

Thomas's apparent failure to comply with Braathen's commands, Braathen's actions were reasonable under the circumstances. The situation at hand was tense, involved a real potential for life threatening circumstances to erupt and required action that was prompt and designed to get a response.

Again, we agree with the district court's analysis. Plaintiffs argue the district court inappropriately considered facts preceding Thomas's arrest in granting Braathen qualified immunity. This contention is frivolous. Graham v. Connor requires taking all relevant circumstances into account, 490 U.S. at 396.

Plaintiffs rely heavily on our decisions in Shekleton and Brown that "use of [a] taser on a nonfleeing, nonviolent suspected misdemeanant was unreasonable." Shekleton, 677 F.3d at 367. But the principle does not apply in this case. Thomas was not nonviolent -- he had participated in an armed standoff resulting in deployment of a SWAT team and then his arrest for felony terrorizing. Called to the scene to transport the brothers to a detention center, Braathen observed that a SWAT team member had handcuffed the brothers and was holding them on the ground at gun point. Thomas resisted lawful arrest by refusing to walk to the patrol car and then by refusing to comply with Braathen's command that he move over so the squad car could transport all three brothers. In response to this dangerous defiance, Braathen deployed his taser in drive stun mode, a use of force that "only causes discomfort and does not incapacitate the subject." De Boise, 760 F.3d at 895 n.5.[6] "[T]he infliction

---

[6]In Brooks v. City of Seattle, 599 F.3d 1018, 1027-28 (9th Cir. 2010), the court observed that "use of the Taser in drive-stun mode is painful, certainly, but also temporary and localized, without incapacitating muscle contractions or significant lasting injury" -- an amount of force "more on par with pain compliance techniques, which this court has found involve a 'less significant' intrusion . . . than most claims of force, even when they cause pain and injury," rev'd on other grounds sub nom. Mattos v. Agarano, 661 F.3d 433 (9th Cir. 2011).

of only *de minimis* injuries supports the conclusion that the officer did not use excessive force." Davis, 794 F.3d at 1012 (quotation omitted).

For these reasons, we conclude the district court did not err in dismissing plaintiffs' claims that Deputy Braathen used constitutionally excessive force in tasing Rodney and Thomas Brossart.[7]

**C. Supervisory Liability.** Sheriff Janke was not present when either Rodney or Thomas was tased and therefore did not directly participate in the alleged use of excessive force. Plaintiffs allege Janke is nonetheless individually liable because he "failed to properly train, supervise, and control Deputy Braathen." Our decision that Braathen did not use excessive force against either Rodney or Thomas forecloses this claim. See Moore v. City of Desloge, 647 F.3d 841, 849 (8th Cir. 2011) ("to maintain an action for training or supervisory liability, a plaintiff must show the failure to train or supervise caused the injury"). Moreover, the failure to train claim is without merit. "When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." S.M. v. Krigbaum, 808 F.3d 335, 340 (8th Cir. 2015). It is undisputed that these tasings were the first that Braathen committed and that neither Nelson County nor Janke had received any prior complaints regarding taser use.

---

[7]The Brossarts object to the district court's dismissal of Susan Brossart's claim in the Amended Complaint for "severe emotional distress and mental anxiety suffered as an indirect, but related, result of the constitutional violations made against her husband and son." This derivative claim is obviously foreclosed by our decision that there was no constitutional violation. In addition, we agree with the district court that the Amended Complaint failed to assert a § 1983 claim for violation of Susan's constitutional rights. See Coon v. Ledbetter, 780 F.2d 1158, 1160-61 (5th Cir. 1986).

**D. Municipal Liability.** Plaintiffs argue the district court erred in dismissing their claims against Nelson County, asserting two theories of municipal liability on appeal: (1) that the Nelson County Taser Policy is unconstitutional, and (2) that the County (and Sheriff Janke) failed to appropriately train its officers in Taser use. Both theories are without merit.

A municipal policy or practice is unconstitutional "on its face" where the policy or practice "itself violates federal law, or directs an employee to do so." Szbala v. City of Brooklyn Park, 486 F.3d 385, 389 (8th Cir. 2007) (en banc), quoting Bd. of the County Comm'rs v. Brown, 520 U.S. 397, 404-05 (1997). Neither the Nelson County Taser Policy or Use of Force Continuum directs an employee to violate the Fourth Amendment. We concluded that a similar taser policy was facially constitutional in Hollingsworth v. City of St. Ann, 800 F.3d 985, 992 (8th Cir. 2015). Plaintiffs, who first briefed this argument in their Reply Brief, argue that the Taser Policy is facially unconstitutional because it permits the use of a taser on non-violent individuals, and "failure to discourage the use of tasers against non-violent subjects can lead to constitutional violations." The argument is both untimely and without merit. "[A] written policy that is facially constitutional, but fails to give detailed guidance that might have averted a constitutional violation by an employee, does not itself give rise to municipal liability." Szbala, 486 F.3d at 392.

A municipality may also be liable where its policies are lawful on their face but municipal action, such as failure to train or supervise, "was taken with deliberate indifference as to its known or obvious consequences" and "led an employee to violate a plaintiff's rights." Hollingsworth, 800 F.3d at 992, quoting Szbala, 486 F.3d at 389-90. As we have explained, plaintiffs' failure to train claim against Nelson County is foreclosed by our conclusion that Braathen's tasing of Rodney and Thomas did not constitute excessive force. Moreover, the absence of prior complaints to Nelson County of improper taser use means there was no pattern of constitutional violations demonstrating that "the need for more or different training [was] so obvious, and the

inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Canton v. Harris, 489 U.S. 378, 390 (1989).

**E. Dismissal of the State Law Claims.** The district court dismissed the Brossarts' state law claims as time-barred. North Dakota law provides that a claim against a political subdivision or Sheriff "must be commenced within three years" after it accrues. N.D.C.C. § 32-12.1-10; 28-01-17. Under North Dakota law, an action is commenced "as to each defendant when the summons is served on that defendant." N.D.C.C. § 28-01-38, N.D. R. Civ. Pro. 3. By contrast, Rule 3 of the Federal Rules of Civil Procedure provides that a "civil action is commenced by filing a complaint with the court." In Walker v. Armco Steel Corp., 446 U.S. 740, 751 (1980), the Supreme Court held that federal "Rule 3 governs the date from which various timing requirements of the Federal Rules begin to run, but does not affect state statutes of limitations."

Plaintiffs filed their Original Complaint on June 23, 2014, three years after the tasing of Rodney Brossart. They served Sheriff Janke by certified mail on June 28, 2014, and all other defendants by process server on July 25, 2014. The district court applied the North Dakota rule and held that the Brossarts' state law claims were time-barred. The court rejected the Brossarts' contention that the federal rule should apply because their Complaint included federal claims, correctly noting that we "subsequently extended the Walker holding to actions involving a 'federal claim along with state claims.'" On appeal, plaintiffs argue the district court cited no Eighth Circuit case, only "Id. at 1286." But that was obviously an oversight, as the court correctly quoted and applied our decision in Appletree Square I, Ltd. v. W.R. Grace & Co., 29 F.3d 1283, 1286 (8th Cir. 1994) (where "[t]he state law claims would be barred in state court . . . they should not be allowed to proceed in federal court."). The Brossarts' suggestion that they are entitled to equitable tolling of the statute of

limitations is contrary to North Dakota law.  See Oakland v. Bowman, 840 N.W.2d 88, 91-92 (N.D. 2013).

The judgment of the district court is affirmed.

KELLY, Circuit Judge, concurring in part and dissenting in part.

I respectfully dissent from Part II.B of the court's opinion.  In determining whether an official is entitled to qualified immunity, we must view the facts "in the light most favorable to the party seeking damages"—here, the Brossarts.  McKenney v. Harrison, 635 F.3d 354, 358 (8th Cir. 2011).  So construed, the facts are that Thomas Brossart was home on the evening of June 23, 2011, when law enforcement entered the Brossarts' property.  Thomas and his two brothers went outside with firearms, and Thomas told the officers to leave because they were trespassing.  Thomas did not know the officers were there to serve a search warrant.  The encounter ended in a standoff, and the officers left the property.  No shots were fired.

The next day, law enforcement returned to the Brossarts' property.  Thomas (on a three-wheeler) and his brothers (on a tractor) approached law enforcement, who were near the Brossarts' silo.  Neither Thomas nor his brothers were carrying firearms.  All three brothers were then arrested, handcuffed, and ordered to lay on the ground at gunpoint.  Officer Braathen and another officer carried Thomas to a police car because he would not walk on his own, and placed him in the back seat.  Thomas remained handcuffed.  Once Thomas was seated in the car, Braathen told Thomas to "move over."  Thomas moved over a couple of inches; he did not know that the officers needed room to place both of his brothers in the back seat with him.  Without warning, Braathen tased Thomas on his left leg for approximately five seconds, resulting in a slight burn.  Another deputy then pulled Thomas to the middle of the back seat.  Thomas said: "This is my property and I don't agree to the sale."

-17-

Viewed in the light most favorable to Thomas, Braathen used excessive force. While the events of the prior evening are relevant to whether the force used against Thomas was excessive, see Graham, 490 U.S. at 396 (reasonableness of use of force under Fourth Amendment "requires careful attention to the facts and circumstances of each particular case"), equally as important are the circumstances immediately surrounding the arrest, including "whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," id.; cf. County of Los Angeles v. Mendez, — S. Ct. —, 2017 WL 2322832, at *6–8 (2017) (officers' prior Fourth Amendment violation cannot render a subsequent reasonable use of force unreasonable). Thomas may have earlier posed a threat to officers, but at the time he was tased, he was handcuffed and secured in the back seat of a police car. See Chambers v. Pennycook, 641 F.3d 898, 907 (8th Cir. 2011) (kicking restrained and non-resisting subject found objectively unreasonable). Multiple officers were at the scene, including at least two in the immediate vicinity of the car. See Brown, 574 F.3d at 498 (finding force less justified where multiple officers were present). There is no evidence that Thomas made any aggressive movements or verbal threats toward Braathen when he was getting into or while he was seated in the police car. See Shekleton, 677 F.3d at 366 (excessive force when officer tased "an unarmed suspected misdemeanant, who did not resist arrest, did not threaten the officer, did not attempt to run from him, and did not behave aggressively towards him"); Bryan v. MacPherson, 630 F.3d 805, 826–27 (9th Cir. 2010) (suspect yelling and standing fifteen to twenty-five feet away did not pose immediate threat); Brown, 574 F.3d at 497 (officer's testimony that plaintiff may have used glass tumbler as weapon insufficient to establish immediate danger when suspect did not reach for glass or threaten officers).

Furthermore, according to Thomas, Braathen told him to "move over," and Thomas—still handcuffed—did so by shifting a couple of inches, not understanding that he was expected to move even further. Such actions, viewed in the light most favorable to Thomas, do not constitute resistance. See Peterson v. Kopp, 754 F.3d

-18-

594, 597, 600 (8th Cir. 2014) (arguing with officer and talking back held to not be resisting); <u>Brown</u>, 574 F.3d at 498 (refusing to hang up phone not resisting arrest). And, according to Thomas, Braathen gave no warning before deploying his taser. <u>See</u> <u>Smith v. Kansas City Police Dep't</u>, 586 F.3d 576, 581 (8th Cir. 2009) (excessive force when plaintiff was forcibly removed from his home before having the opportunity to comply with commands); <u>Brown</u>, 574 F.3d at 497 (summary judgment not appropriate where evidence presented jury question as to whether officer warned plaintiff that she would be tased). Similarly, Braathen did not tell Thomas why he needed to move, and another officer was able to successfully pull Thomas into the middle seat. <u>See</u> <u>Tatum v. Robinson</u>, — F.3d —, 2017 WL 2324709, at *2 (8th Cir. 2017) (though use of some degree of force may have been reasonable, use of taser was not). Though Braathen contends that Thomas refused to comply with his order and that Braathen warned Thomas that he would be tased, those assertions are directly contradicted by Thomas' deposition testimony. "This court may not resolve genuine issues of material fact in [Braathen's] favor at the summary judgment stage." <u>Id.</u> at *6.

Because the facts here establish a genuine issue of material fact as to whether officers used excessive force during Thomas' arrest and demonstrate that Thomas' right to be free from this excessive force was clearly established at the time of the events, I would reverse the grant of summary judgment on Thomas Brossart's excessive force claim and remand for further proceedings. I concur in the court's opinion in all other respects.

_____