# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3523
_____

Darrell Frederick, Personal Representative
of the Estate of Fallon Frederick, Deceased

*Plaintiff - Appellant*

v.

Vince Motsinger, et al.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville

_____

Submitted: June 8, 2017
Filed: October 17, 2017

_____

Before LOKEN, MURPHY, and MELLOY, Circuit Judges.

_____

LOKEN, Circuit Judge.

Police officers called to a convenience store in Rogers, Arkansas, confronted Fallon Frederick, holding a four-inch folding knife and erratically pacing back and forth in a corner near two restrooms. Frederick refused to comply with Sergeant Scott Clifton's repeated commands to drop the knife. Officer Nick Torkelson discharged

his taser but Frederick blocked one probe with her purse and charged the officers. Officer Vence[1] Motsinger, providing cover for Torkelson, shot and killed her.

The representative of Frederick's Estate, Darrell Frederick, filed this action against the City of Rogers and Officers Motsinger, Clifton, and Torkelson asserting excessive force Fourth Amendment claims under 42 U.S.C. § 1983; false arrest and assault and battery claims under state law; and claims under the Arkansas Wrongful Death Statute (AWDS) and Arkansas Civil Rights Act (ACRA). Defendants moved for summary judgment on the merits, also asserting the defense of qualified immunity from Fourth Amendment damage claims against the individual officers. In response, the Estate withdrew its official capacity claims against the officers and the City. The district court,[2] applying Graham v. Connor, 490 U.S. 386 (1989), to the Fourth Amendment and ACRA excessive force claims,[3] granted summary judgment dismissing all remaining claims. The Estate appeals dismissal of the excessive force claims. Reviewing the grant of summary judgment *de novo* and viewing the facts in the light most favorable to the Estate as the non-moving party, we affirm. Brossart v. Janke, 859 F.3d 616, 620 (8th Cir. 2017) (standard of review).

## I.

Frederick entered the convenience store just after 10:30 a.m. on August 1, 2011. A store surveillance video captured the tragic events of the next ten minutes, and Officer Torkelson's microphone audio-recorded events after he arrived. Holding a four-inch folding knife, Frederick told store clerk Elida Sandoval to call 911. From

---

[1]The case caption misspells Motsinger's first name as "Vince."

[2]The Honorable Timothy L. Brooks, United States District Judge for the Western District of Arkansas.

[3]The parties agree with the district court that Arkansas courts analyze ACRA excessive force claims under Graham's objective reasonableness standard.

behind a counter, the frightened Sandoval handed Frederick the phone. Frederick dialed 911. Audio of the call records her asking the operator to send police because she was "being followed." The operator asked for more detail; Frederick hung up and dialed again. A second operator asked what was happening. Frederick responded, "I really would like to say, but I would like a police officer to show up, please." The operator told Frederick police were en route to the store. Dispatchers notified police that the caller at the store was "irate," "not listening," and unable to answer questions about who was following her.

Officer Motsinger was dispatched to the scene. Sergeant Clifton was near the store, heard the dispatch, and went to the store to comfort the caller until Motsinger arrived. Clifton entered the store's northwest corner and saw Frederick, who had walked to the northeast corner, next to doors to two restrooms. Frederick demanded, "I want to see your badge number." Clifton stated it. Frederick excitedly announced she had a knife, which Clifton could see. Clifton backed away from Frederick, drew his firearm, and radioed for assistance, stating "I've got one at gunpoint; she's got a knife inside the store." Frederick said she did not believe Clifton was a police officer, again asked his badge number, and demanded to know where his backup was, making quick, impatient movements. A customer rushed out of the store. Clifton, concerned someone might exit the restrooms, told Frederick to drop the knife, saying, "I'm here to help you. Nobody has to get hurt." Frederick did not comply.

Officer Nick Torkelson arrived one minute after Clifton requested backup. When Torkelson entered, Frederick asked his badge number. Clifton responded. Frederick asked why Clifton knew Torkelson's badge number. Clifton explained he was a supervisor on the force. Torkelson told Clifton he had a beanbag shotgun in his patrol car; Clifton directed Torkelson to use his taser instead. Torkelson proceeded down the aisle toward Frederick, who was holding the knife "in a stabbing position" or "pick style." Like Clifton, Torkelson was unable to assess who else was in the store. Frederick told Torkelson, "I do not believe that you're a police officer,"

and "I'm a paranoid schizophrenic." Torkelson said, "I'm gonna have to tase you if you don't drop the knife, okay? I need you to drop the knife."

At this point, Motsinger entered the store and saw that Clifton's gun was drawn and Torkelson was deploying his taser at Frederick. Motsinger proceeded down the aisle to provide Torkelson lethal cover. Torkelson and Clifton again asked Frederick to drop the knife but she did not. Torkelson waited until Frederick's blade was facing down, so she would not fall on it, and discharged his taser. One probe struck Frederick in the chest but the other lodged in her purse, so the probes did not complete an electrical circuit and Frederick was not incapacitated. She paused for a moment, then yelled, raised her knife, and charged toward Torkelson in an apparent effort to stab him. The store video confirms that Frederick charged with her knife in a stabbing position. Torkelson testified he "was in fear that she was going to stab me." Motsinger testified that he feared for Torkelson's life when Frederick started charging toward him. As Torkelson retreated, Motsinger threw him out of the line of fire and fired three shots at Frederick, who succumbed to the wounds.

Both Clifton and Torkelson testified that throughout this encounter they believed Frederick was impaired by methamphetamine or some other stimulant, as she was moving erratically and expressing illogical thoughts. Both officers were dressed in police attire, with name tags, firearms, patches, and duty belts, but Frederick repeatedly questioned whether they were police officers. After the incident, store clerk Sandoval told police that Frederick appeared to be "on drugs," as she was shaking and sweating in an abnormal manner. Toxicology tests confirmed that Frederick was under the influence of methamphetamine at the time.

In the district court, the parties debated when Frederick was seized for Fourth Amendment purposes. Defendants argued seizure occurred when Frederick was shot. The Estate focused on the events preceding the shooting, including Torkelson's attempted tasing. The district court concluded that Clifton seized Frederick when he held her at gunpoint and she submitted to that authority until after the attempted tasing, when she charged at Torkelson with her knife. The district court concluded that the officers were objectively reasonable in tasing Frederick and then shooting her when she charged them, and that the officers are entitled to qualified immunity because they did not violate Frederick's clearly established Fourth Amendment rights.

On appeal, the Estate's Brief argued that summary judgment was improperly granted because the officers' use of excessive force in tasing Frederick violated the Fourth Amendment and proximately caused Frederick's killing because it provoked her violent reaction that gave rise to Motsinger's use of deadly force. The Estate relied on the Ninth Circuit's "provocation rule" -- "Where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force." Glenn v. Wash. Cty., 673 F.3d 864, 879 (9th Cir. 2011); contra Schulz v. Long, 44 F.3d 643, 648-49 (8th Cir. 1995) (evidence officers created need for use of deadly force irrelevant to reasonableness issue).

With this appeal awaiting oral argument, the Supreme Court rejected the Ninth Circuit's provocation rule, agreeing with other circuits that its "fundamental flaw is that it uses another constitutional violation to manufacture an excessive force claim where one would not otherwise exist." Cty. of L.A. v. Mendez, 137 S. Ct. 1539, 1546 (2017). The Court made clear that "the objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional." Id. at 1547. If the use of deadly force was objectively reasonable under Graham,

based on what the officers knew when the force was applied, "it may not be found unreasonable by reference to some separate constitutional violation." Id. at 547 n.*.

The Estate's Brief did not argue that it was objectively unreasonable for Officer Motsinger to use deadly force against a suspect who was charging a fellow officer with a knife raised in a stabbing position. Our prior cases support the district court's conclusion that Motsinger's use of deadly force in this situation was reasonable. See Aipperspach v. McInerney, 766 F.3d 803, 806 (8th Cir. 2014), cert. denied, 135 S. Ct. 1415 (2015); Estate of Morgan v. Cook, 686 F.3d 494, 497 (8th Cir. 2012); accord City & Cty. of S.F. v. Sheehan, 135 S. Ct. 1765, 1775 (2015). Consistent with this precedent, counsel for the Estate conceded at oral argument that, applying Mendez, the shooting of Frederick did not in itself give rise to a Fourth Amendment violation.

At oral argument, the Estate argued that the attempted tasing was objectively unreasonable, and this was a distinct Fourth Amendment claim raised and argued in the district court and vigorously pursued on appeal. The Supreme Court in Mendez noted "the principle that plaintiffs can -- subject to qualified immunity -- generally recover damages that are proximately caused by any Fourth Amendment violation. . . . The harm proximately caused by . . . two [Fourth Amendment] torts may overlap, but the two claims should not be confused." 137 S. Ct. at 1548. Thus, we must address the Fourth Amendment tasing claim.

## III.

The Fourth Amendment's objective reasonableness standard governs claims that officers "used excessive force in the course of making an arrest, investigatory stop, or other 'seizure.'" Graham, 490 U.S. at 388. The inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to

-6-

evade arrest by flight." Id. at 396. Courts must consider "the reasonableness of a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Mendez, 137 S. Ct. at 1546 (quotation omitted). We assess the reasonableness of each individual officer's conduct, because "§ 1983 liability is personal." Doran v. Eckold, 409 F.3d 958, 965 (8th Cir.) (en banc), cert. denied, 546 U.S. 1032 (2005).[4] Contrary to the Estate's contention, whether the officers' use of force was constitutionally excessive is an issue of law for the court. Brossart, 859 F.3d at 624.

Numerous cases have upheld use of tasers to control potentially violent, defiant detainees who pose a safety risk to the officers or others, particularly when the officer warns that a taser will be used, as Officer Torkelson did here. See Id. at 625; De Boise v. Taser Int'l, Inc., 760 F.3d 892, 896 (8th Cir. 2014), cert. denied, 135 S. Ct. 2348 (2015). On the other hand, we have held that it is "unlawful to Taser a nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's commands was to disobey two orders to end her phone call to a 911 operator." Brown v. City of Golden Valley, 574 F.3d 491, 499 (8th Cir. 2009), followed in Shekleton v. Eichenberger, 677 F.3d 361, 366 (8th Cir. 2012). In this case, we agree with the district court that Officer Torkelson's decision to use non-lethal force, his taser, in an attempt to disarm Frederick after she refused repeated warnings to drop a four-inch knife was objectively reasonable -- Frederick was in a small commercial space, in front of restrooms that might have been occupied, and brandishing a weapon that posed a danger to the officers and store customers.

The Estate argues that Frederick had not directly threatened the officers with her knife before she was tased. But she was acting erratically, expressing irrational

---

[4]Officer Motsinger entered the store only seconds before Torkelson discharged his taser, so Motsinger cannot be personally liable for this use of force.

-7-

thoughts, holding a knife in a stabbing position, challenging the officers' authority, and disobeying commands to drop her knife. While Frederick did not lunge at the officers prior to being tased, Torkelson and Clifton reasonably perceived she was ready to use her knife against them or others. As in Scott v. Harris, "it is clear from the videotape that [Frederick] posed an actual and imminent threat" of harm to the officers and others in the store. 550 U.S. 372, 384 (2007). The officers did not need to wait until Frederick attacked them. "[I]t is reasonable for police to move quickly if delay would gravely endanger their lives or the lives of others." Sheehan, 135 S. Ct. at 1775 (quotation omitted). Even if she was suffering from mental illness or other impairment, the relevant inquiry is whether she posed a threat, not what prompted her threatening conduct. See Morgan, 686 F.3d at 498 (intoxication); Hayek v. City of St. Paul, 488 F.3d 1049, 1055 (8th Cir. 2007) (mental illness); Hassan v. City of Minneapolis, 489 F.3d 914, 919 (8th Cir. 2007) (mental illness); Sanders v. City of Minneapolis, 474 F.3d 523, 527 (8th Cir. 2007) (mental illness).

The district court also held that the officers are entitled to qualified immunity because "it was certainly not clearly established that tasing a person standing in a public area who refused several commands to drop a knife would violate that person's constitutional rights." We agree. What is "clearly established law should not be defined at a high level of generality . . . [but] must be particularized to the facts of the case." White v. Pauly, 137 S. Ct. 548, 552 (2017) (quotation omitted). Although the Supreme Court "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the . . . constitutional question beyond debate" at the time the officers acted. Id. at 551 (quotation omitted). As the above-cited Eighth Circuit cases demonstrate, existing precedent did not place "beyond debate" that the officers violated Frederick's Fourth Amendment rights when they discharged a taser at Frederick in these circumstances.

The judgment of the district court is affirmed.

_____